**R.C., by his next friend, the ALABAMA DISABILITIES ADVOCACY PRO-GRAM, on behalf of himself and those similarly situated, Plaintiffs,**

v.

**Martha NACHMAN, Commissioner of the Alabama Department of Human Resources, Defendant.**

Civil Action No. 88–D–1170–N.

United States District Court, M.D. Alabama, Northern Division.

June 16, 1997.

Ralph S. Tyler, Patrick J. Reynolds, Hogan & Hartson, Baltimore, MD, Ira A. Burnim, Bazelon Ctr. for Mental Health Law, Washington, DC, David Schoen, James Tucker, ACLU of Alabama, Richard Cohen, Southern Poverty Law Center, Montgomery, AL, for plaintiffs.

John J. Park, Jr., Deputy Attorney General, Kathy P. Brasfield, Assistant Attorney General, Dept. of Human Resources, Mark G. Montiel, Montgomery, AL, for defendant.

## *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the Court is defendant's "motion to vacate or modify the consent decree" filed July 29, 1996. Plaintiffs filed a memorandum in opposition on September 16, 1996. On May 6, 1997, the Court heard oral argument on defendant's motion.

## BACKGROUND

Plaintiff R.C.[1] commenced this action by filing a three count complaint on November

1. At the time the complaint was filed, R.C. was a minor child in the custody of the Alabama Department of Human Resources. The Court per-

15, 1988, against Andy Hornsby, then-Commissioner of the Alabama Department of Human Resources ("DHR"). R.C. subsequently amended his complaint to add a fourth cause of action and to add "class" allegations.

In his complaint, R.C. painted a picture of a child welfare system gone awry and illustrated the dramatic impact of that system on his life. R.C. initially entered this system when a family court, responding to allegations that R.C. was abused by his mother, placed R.C. under the supervision of DHR and in the custody of his father. Subsequently, allegations were made that R.C.'s father was neglecting him. Without attempting to provide services or support to R.C. or his father, DHR removed R.C. from his father's custody and placed him in a psychiatric hospital.

Although R.C. was emotionally disturbed and, as a result, sometimes behaved inappropriately, he was never diagnosed as psychotic or seriously emotionally ill. After less than a month at the psychiatric hospital, R.C. was discharged and transferred to the psychiatric unit of a second hospital. While at this second hospital, R.C. was given large doses of psychoactive medications. R.C.'s stay at the second hospital lasted approximately a month and a half, whereupon R.C. was transferred to a home for children. R.C. remained at this home for only six days. R.C. was then returned to the psychiatric unit of the second hospital and was again medicated with large doses of psychoactive drugs.

R.C. remained in the second hospital for nearly six months. He was then transferred to a home for children who are psychotic or suffer serious behavioral disorders. This home was located over two hundred miles from R.C.'s parents' residences, making regular contact between R.C. and his parents very difficult. R.C. continued to reside in this home through the time the complaint was filed. Throughout these placements, R.C. maintains that he was not given appropriate treatment or services. As a result, R.C.'s emotional condition significantly deteriorated.

R.C.'s four-count complaint contained two constitutional claims and two statutory claims. First, R.C. claimed that the defendant impinged his right to be free from unwarranted governmental interference with his family. Second, R.C. asserted that defendant violated his constitutional right to receive adequate care and treatment while in defendant's custody. Third, R.C. alleged that defendant failed to comply with obligations imposed on DHR by the Adoptions Assistance and Child Welfare Act ("AACWA"), 42 U.S.C. 601 *et seq.* Finally, R.C. asserted that defendant's conduct violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[2]

Defendant moved to dismiss R.C.'s claims. On April 19, 1989, the Honorable Joel F. Dubina, then a district judge and to whom this case was originally assigned, denied defendant's motion, finding that each of R.C.'s claims was viable. The Court then considered R.C.'s petition for class certification. On July 26, 1989, the Court found that R.C.'s petition was due to be granted and certified a class consisting of "all children in the custody, or who may in the future be in the custody, of the Alabama Department of Human Resources who are behaviorally disordered or emotionally disturbed and who have suffered violations of their federal statutory or constitutional rights." By order dated July 12, 1990, the Court refined the class definition to include children in foster care or DHR custody who fit any one of the following descriptions:

(1) The child has been diagnosed as being emotionally disturbed or as having a behavioral disorder;

(2) Although the child has not been formally diagnosed emotionally disturbed, DHR or the facility in which the child resides considers the child to be emotionally disturbed;

(3) The child has been adjudicated a delinquent;

mitted R.C. to proceed anonymously to protect his privacy.

**2.** Although not asserted, the common-law doctrine of *parens patriae* may also have afforded plaintiffs a basis for relief.

(4) The child is receiving special education as an EC (emotionally conflicted) child;

(5) The child is residing in any [specified facility];

(6) Although the child has not been formally diagnosed as having a behavioral disorder, the child is considered to have a behavior disorder by DHR or the facility in which the child resides. A child has a "behavior disorder" if DHR or the facility considers the child to fit in any *one* of the following descriptions:

(i) the child has persistent behavior problems; (ii) the child commits significant rule infractions; (iii) the child persistently absents himself from his placement without permission or runs away; (iv) the child commits actions that if committed by adults would be crimes; (v) the child engages in aggressive behavior that places the child or others at risk of injury; (vi) the child engages in self-injurious behavior; (vii) the child is residing in a facility operated or certified by the Alabama Department of Mental Health and Mental Retardation, and the child has been placed in the facility for reasons other than the child's mental retardation; (viii) the child is residing in a facility operated or licensed by the Alabama Department of Youth Services; *or* (ix) the child has been identified by DHR as having behavior problems. Such children may be emotionally disturbed, mentally retarded, or otherwise developmentally disabled. On the other hand, they may suffer from no handicap other than their behavior disorder.

(7) The child is considered by a foster home or the child's own home to be in need of evaluation to determine whether the child is emotionally disturbed or has a behavior disorder as described in (6) above.

As the case neared trial, the parties began engaging in serious settlement negotiations. A consent decree was drafted by plaintiffs and given to defendant for consideration. Defendant's attorneys and staff reviewed the consent decree. What followed were several weeks of intense negotiations during which the decree was significantly refined.

Before the consent decree could be presented to the Court, it had to be approved by Commissioner Hornsby, then-Attorney General Jimmy Evans, and, by implication, then-Governor Guy Hunt. The decree was presented to Commissioner Hornsby after extensive review by DHR staff, attorneys, and legal counsel. Those reviewing the decree included Bill Prendergast, Chief Legal Counsel for DHR, P.L. Corley, DHR's Deputy Commissioner for Fiscal and Administrative Services, Paul Vincent, Director of DHR's Family and Children Services, Norma Manush, Assistant Director of DHR's Family and Children Services, Sharon Ficquette, Assistant Attorney General for DHR, James E. Long, Assistant Attorney General for DHR, David Christy, Assistant Attorney General, H.E. "Chip" Nix, Jr., a privately practicing attorney leading DHR's defense and Chip Vercelli, an additional attorney defending DHR. Of the reviewers, only Chip Vercelli voiced any serious disagreement with the decree. *See* "File Memorandum" of James E. Long dated May 2, 1991, attached to def.'s motion.

To assist Governor Hunt, Commissioner Hornsby and Attorney–General Evans in the decision making process, DHR's lead defense attorney, H.E. Nix, Jr., Esq., provided Commissioner Hornsby with a point-by-point "won and lost" chart detailing the reasons for endorsing the decree rather than proceeding to trial. *See* May 14, 1991 letter from H.E. Nix, Jr. to Commissioner Hornsby attached to def.'s motion. According to Mr. Nix, the case, if tried, posed "a clear victory for the plaintiffs." Mr. Nix expressed his concern that the facts which would come out at trial would be "devastating" and "would dispose the court against DHR in future hearings." Under the consent decree, Mr. Nix asserted that DHR would maintain control of the Foster Care System and have greater autonomy than if the case were tried. Finally, Mr. Nix pointed out that endorsing the consent decree would result in a substantial monetary savings to defendant. Commissioner Hornsby, Attorney General Evans and Governor Hunt agreed that the consent decree best protected DHR's and the State's interests and endorsed the decree.

On June 11, 1991, the Court conditionally approved the consent decree pending notice to the class and a hearing on the fairness and adequacy of the decree. The plaintiff class in the decree differed from the plaintiff class previously certified by the Court. The class in the decree was defined as follows:

7. The 'plaintiff class' is all children who are now, or in the future will be, children in foster care and/or DHR custody who have emotional or behavioral disorders. The class consists of the following children:

a. Children with severe emotional or behavioral problems who are in foster care and/or DHR custody, or who are at imminent risk of placement into foster care and/or DHR custody. DHR shall promulgate a definition, acceptable to the parties, of 'severe emotional or behavioral problems.' The definition shall be within the 'parameters' that have been formulated by the CASSP program of the National Institute of Mental Health.

b. Children with moderate or mild emotional or behavioral problems who are in foster care and/or DHR custody, or who are at imminent risk of placement into foster care and/or DHR custody. Children who meet any of the descriptions in paragraphs 1–6 of the Supplemental Recommendation of the Magistrate Concerning Class Certification, filed May 15, 1990, and who do not have severe emotional or behavioral problems, shall be considered 'children with moderate or mild emotional or behavioral problems.'

c. Children who are at high risk of developing emotional or behavioral problems and who are at imminent risk of placement into foster care and/or DHR custody. Defendant shall develop a definition, acceptable to the parties, of which children at imminent risk of placement are 'at high risk of developing emotional or behavioral problems.' While the defendant shall have broad discretion to develop and modify the definition, approximately 35% of all children at imminent risk of placement shall be deemed to be 'at high risk of developing emotional or behavioral problems.' Defendant shall consider including in the definition of those 'at high risk' children who have previously been admitted to foster care and/or DHR custody.

The Court was briefed by both parties on the fairness of the decree, and on December 18, 1991, the Court approved the decree, specifically finding it to be "both fair and reasonable."

The decree was intended to redress plaintiffs' injuries and transform the Alabama child welfare system. Rather than setting out the precise means for accomplishing these objectives, the decree sets forth "goals" and a "system of care" consisting of "operating principles" or "standards" designed to achieve the "goals." The decree contemplated that the parties would first evaluate the child welfare system to determine its resources, capabilities and needs. DHR was then required to develop an "implementation plan," by October 1, 1992, to put the "operating principles" and "standards" of the consent decree into place throughout Alabama. DHR failed to meet this deadline. An "implementation plan" was finally approved by the Court on November 1, 1993. Additionally, on this date the Court set a number of deadlines to ensure that defendant continued to move towards full compliance with the consent decree.

The implementation plan called for the phased-in "conversion" of all Alabama counties. Each year, for seven years, specified counties were to be "converted"—to implement the system of care in the consent decree—until all counties were in compliance with the consent decree. This process was to be completed by 1999. A "monitor" was appointed to oversee the conversion process.[3] The monitor was designated as the Court's agent and was given the responsibility of assessing defendant's compliance with the consent decree and apprising the Court of the same.

According to the monitor, defendant initially made substantial progress towards compliance with the consent decree. The monitor advised the Court that safety risks to chil-

---

**3.** Dr. Ivor Groves, Ph.D., was, and continues to be, the monitor.

dren due to systemic deficiencies had been greatly reduced in those counties that had begun the process of conversion. Funding, staffing, treatment and services all saw marked improvements during the early stages of implementation. Unfortunately, this was a trend which, according to the monitor, did not continue.

In his most recent report, the monitor identified a number of troubling signs that have developed since the end of 1995. *See* Monitor's Implementation Status Summary, March 1997. The monitor found that a hiring freeze, inadequate funding for care and services, the elimination of outside technical assistance and a reduction in intensive training were all cause for serious concern over the likelihood of continued and future consent decree compliance. *Id.* at 5–6. In practical terms, these changes resulted in a rise in the number of children in foster care, frequent delays in the investigation of reports of child abuse and neglect, and less individualized attention and planning for class members. *See id.* at 6–17. If the current trend continues, the monitor believes that counties that have achieved conversion will shortly lose this status and that conditions in counties yet to achieve conversion will become increasingly grave. *Id.* at 5–6.

Not surprisingly, during this same period of time, there has been a breakdown in the relationship between the parties. Similarly, the relationship between the monitor and defendant has grown strained. The free flow of information between the parties and the monitor has dissipated. The parties' frequent disagreements have resulted in a rash of filings with this Court and ultimately led defendant to file its motion to vacate or modify the consent decree.

## DISCUSSION

■ In this case the plaintiffs sought injunctive relief, an equitable rather than legal remedy. As a court of equity, the Court must use all its inherent powers to do justice, granting such relief as fairness and good conscience require. 27A Am.Jur.2d *Equity* § 110 (1996). Because the plaintiff class in this case is composed of minor children, the Court must exercise its duty with their best interests in mind. *See Panitch v. Wisconsin,* 451 F.Supp. 132, 136 (E.D.Wis.1978) (court has equitable responsibility to protect interests of minor litigants who cannot protect themselves); *Bibeau v. Northeast Airlines, Inc.,* 429 F.2d 212, 213 (D.C.Cir.1970) (when exercising its discretion, court should be mindful of its obligation to protect the interests of minor children); *Crane v. Jordan,* 475 So.2d 542, 545 (Ala.1985) (duty of court to protect the interest of minor children with respect to settlement agreement). This Court is firmly committed to the protection of the minor plaintiffs, and its decisions in this case will be heavily influenced by consideration of the minors' best interests.

■ The defendant is before the Court asking the Court to vacate or reform the consent decree. Ordinarily, a party who comes to a court of equity seeking relief must come with "clean hands," or the court will turn the applicant away. 27A Am.Jur. *Equity* § 126 (1996). That is, the defendant must have acted in good faith; if defendant's wrongdoing has helped create the situation from which defendant seeks relief, the doors to a court of equity will not open. *Id.*

■ Defendant does not come to the Court unsullied. Almost six years ago, on the eve of trial, defendant made a calculated decision to settle this case. The decision was a difficult one; defendant was forced to make some concessions which it may have avoided had it gone to trial.[4] However, to defendant, the benefits of settlement seemed to far outweigh its drawbacks. According to Mr. Nix, the evidence which would have been produced at trial would have been "devastating," seriously damaging the public's confidence in DHR and prejudicing the Court against DHR. Settlement avoided this result. Equally advantageous for DHR was the fact that, if the case settled, DHR would retain control of the foster care system, whereas if

4. This fact is memorialized in the consent decree, viz.: "Both the plaintiffs and the defendant have made concessions that they believed were unnecessary in light of prevailing law and the facts of this case. Likewise, both plaintiffs and the defendant have obtained concessions they might not have obtained from this Court." Consent Decree at 1.

the case had proceeded to trial, a loss of control was all but certain. For plaintiffs, on the other hand, settlement provided certainty and the promise of substantial improvements to what they perceived as a woefully inadequate child welfare system.

For defendant, the benefits of settlement were realized the day the Court approved the consent decree. Damaging evidence was kept out of the Court's and the public's eye, substantial expenses were avoided, and control and autonomy were retained. Defendant's obligations, however, were not and could not be immediately discharged. The overhaul of a child welfare system is not a short-term project. In fact, the parties estimated that defendant would need at least eight years to discharge its obligations. *See* Consent Decree at ¶ 93 ("On or after October 1, 1999, the defendant may move for termination of this decree."). As it turns out, this was an overly-optimistic estimate. While defendant has made progress, substantial compliance remains a distant goal.

Having realized the substantial benefits of settlement, defendant now comes to the Court and asks that the Court vacate or reform the decree. Defendant freely admits that it has not lived up to its end of the bargain[5] but nevertheless asks that it be relieved of its obligations. In essence, defendant wants to have its cake and eat it too. Equally inequitable is the timing of defendant's request. Defendant waited over five years to request that the Court vacate or modify the decree. Defendant could have raised its challenge to the decree at any time,[6] but instead, delayed its challenge for no apparent reason.[7] Plaintiffs, in the meantime, have relied on the promise made by Alabama's highest state officials and foregone the lawsuit which in the words of

DHR's lead counsel, "pose[d] a clear victory for the plaintiffs." Whether plaintiffs, if they were forced to now try this case, could amass the evidence and resources which would again put them in the position of clear victory, is uncertain. What is certain, however, is that in the interim—that lengthy period necessary for a case to wind its way through our court system—plaintiffs, minor children, will suffer. Plaintiffs will have neither the consent decree to compel the reform of DHR nor court-ordered relief (which plaintiffs might have obtained had there been a trial) to protect their interests and safeguard their well-being.

It is clear, therefore, that defendant does not come to the Court with "clean hands." If the Court's decision rested on equitable principles alone, the decision would not be a difficult one. Defendant, however, does not ask the court for relief on equitable grounds alone; instead defendant raises several specific legal challenges to the consent decree. Therefore, while the Court will continue to be informed by the principles of equity, the Court must perform a legal analysis in addition to the equitable analysis performed above.

■ Defendant asks the Court to vacate or modify the consent decree under Rule 60(b)(4), (5) and (6) of the Federal Rules of Civil Procedure. Rule 60, entitled "Relief from Judgment or Order," provides in pertinent part:

(b) **Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.** On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void; (5) the judgment has

---

5. For instance, during oral argument counsel for defendant, Attorney General Bill Pryor, stated that DHR had not complied with the terms of the consent decree and that the prospects of future compliance were similarly dim.

6. As will be discussed *infra*, defendant's motion rests on two legal grounds. The first, a challenge to the standing of the plaintiff class, could have been raised at any time since the entry of the consent decree. The second is premised on the Supreme Court's decision in *Suter v. Artist M.,*

503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1, which was decided in 1992.

7. Defendant offers no reason for its delay in filing its motion. If the Court were to speculate, it would guess that political gamesmanship played perhaps the biggest role in determining the timing of this challenge. What was convenient and beneficial for one administration has saddled its successor with serious obligations with which it would rather not comply.

been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

Rule 60(b) is intended to strike a balance between the need for finality in judgments and equity's mandate to do that which is just. *See Nemaizer v. Baker,* 793 F.2d 58, 61 (2d Cir.1986); *Cook v. Birmingham News,* 618 F.2d 1149, 1153 (5th Cir.1980). Because final judgments should not be "lightly reopened," *Griffin v. Swim–Tech Corp.,* 722 F.2d 677, 680 (11th Cir.1984), 60(b) relief is afforded only upon a showing of exceptional circumstances, *Tucker v. Commonwealth Land Title Ins. Co.,* 800 F.2d 1054, 1056 (11th Cir. 1986).

Defendant asserts three grounds or "exceptional circumstances" for vacating or modifying the consent decree. First, defendant claims that the decree is the product of collusion. Second, defendant believes that the plaintiff class, as defined in the consent decree, lacks standing. Finally, defendant claims that there has been a significant change in the law since the entry of the consent decree which mandates that the Court vacate or modify the decree. During oral argument, defendant refined its position, stating that it did not seek to vacate the decree because of collusion but rather that collusion explains how the plaintiff class came to be defined in the consent decree.

## I. FRAUD AND COLLUSION

Because defendant devotes a significant portion of its brief to expounding a theory of collusion, the Court will briefly address this contention notwithstanding defendant's oral disclaimer. "Collusion" is defined as: "A secret combination, conspiracy, or concert of action between two or more persons for

fraudulent or deceitful purpose." Black's Law Dictionary 264 (6th ed.1990). Defendant's counsel, Attorney General Bill Pryor, stated unequivocally during oral argument that all persons endorsing the consent decree conspired to defraud the Court. Included among the conspirators, according to Mr. Pryor, were former Alabama Governor Guy Hunt, former Alabama Attorney General Jimmy Evans, former Commissioner of DHR Andy Hornsby, Bill Prendergast, former Chief Legal Counsel for DHR, Sharon Ficquette, Assistant Attorney General for DHR, James E. Long, former Assistant Attorney General for DHR, H.E. "Chip" Nix, Jr., the attorney who led DHR's defense and Chip Vercelli, an attorney defending DHR along with Mr. Nix.

■ Under Rule 60(b)(3) a party may seek relief from a judgment for "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." To obtain relief under 60(b)(3), a motion must be made within one year from the date judgment is entered. This limitation undoubtedly explains why defendant does not seek relief under 60(b)(3); the consent decree was entered over five years prior to the date defendant submitted its motion.

Defendant, however, may seek to proceed under Rule 60(b)(6) which allows, *inter alia,* relief when there has been a "fraud upon the court" and which is subject only to a "reasonable" time limitation.[8] "Fraud upon the court" is a narrow species of the general fraud which may afford relief under Rule 60(b)(3).

It is well-settled that " 'fraud upon the court' should [ ] embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct." Fraud upon

---

8. Even if defendant had evidence of a "fraud upon the court," which the Court finds it does not, for the reasons discussed in part III, *infra,* the Court finds that defendant's motion was not made within a "reasonable" time.

the court is thus, "typically confined to the most egregious cases, such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.*, 12 F.3d 1080, 1085–86 (Fed.Cir.1993). Thus, to obtain relief under 60(b)(6), defendant must present evidence to the Court which establishes that, at the time the consent decree was submitted to the Court for approval, the Court's impartiality was impaired.

■ Defendant offers no extrinsic evidence of fraud upon the court. Instead, defendant claims that because the above-named Alabama Executives and legal counsel for DHR agreed to a class definition in the consent decree which was broader than that previously certified by the Court, defendant's attorneys and the Alabama Executive Officers named above perpetrated a fraud upon the Court. Defendant reasons that since it had vigorously opposed plaintiffs' earlier attempts to obtain class certification, the voluntary adoption of an *expanded* class definition in the consent decree could only be the product of collusion. Defendant's reasoning is flawed.

The process defendant relies on as "evidence" of collusion is inherent in every consent decree. Parties *agree* to terms and arrangements which, during the earlier stages of litigation, are frequently at the core of the parties' dispute. The consent decree itself recites: "The parties' agreement to entry of this decree is the outcome of negotiations and bargaining. *Both the plaintiffs and the defendant have made concessions that they believed were unnecessary in light of prevailing law and the facts of this case."* Consent Decree at I (emphasis added). Rather than "collusion," defendant's agreement to an expanded class definition can be seen as an ordinary result of settlement negotiation.

Whatever defendant's motivation, the relevant inquiry remains the same: did the alleged collusion impair the *Court's* objectivity? Defendant's "evidence" falls far short of demonstrating that the *Court's* objectivity was in any way compromised.

■ Prior to entering the consent decree, it was the Court's duty to determine whether the decree jointly submitted by the parties was fair, adequate and reasonable, *Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir. 1985), *cert denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986), *Dillard v. Foley*, 926 F.Supp. 1053, 1062–63 (M.D.Ala.1996), and to determine whether-the decree violated public policy, *In re Smith*, 926 F.2d 1027, 1029 (11th Cir.1991); *Dillard*, 926 F.Supp. at 1062–63. This independent inquiry is made to ensure-that the decree is not the product of collusion and that the interests of all members of the plaintiff class are adequately protected. *Piambino*, 757 F.2d at 1139. Judge Hobbs [9] made this independent inquiry and expressly found that the consent decree was fair, adequate and reasonable. *See* Memorandum Opinion, entered December 18, 1991. There is no evidence in the record which suggests that Judge Hobbs was unwilling or unable to impartially review the consent decree.[10] Defendant has failed to demonstrate that any party actively misled or deceived the Court.[11] *Compare Broyhill Furniture Indus.*, 12 F.3d at 1086–87 (no relief under

---

**9.** The Honorable Truman Hobbs, now Senior United States District Judge for the Middle District of Alabama, presided over this matter at the time the parties submitted the consent decree for approval.

**10.** To the contrary, plaintiffs' "pre-hearing memorandum regarding fairness of the proposed consent decree" served to remind Judge Hobbs of his duty to independently determine whether the decree was fair, adequate, reasonable and in conformity with public policy.

**11.** The fact that Judge Hobbs did not comment separately on each provision of the consent decree lends no credence to defendant's argument. That is, the mere fact that Judge Hobbs did not separately address the expanded class definition in the consent decree does not mean that he did not consider its propriety. In any case, this Court is unwilling to second-guess Judge Hobbs some six years after the consent decree was approved. Judge Hobbs was in a far better position than this Court to assess the bargaining process which led to the consent decree. The Court declines defendant's invitation to walk down the slippery slope of its nebulous claim of collusion.

60(b)(6) where fraudulent evidence was not submitted to court) *with Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 245–46, 64 S.Ct. 997, 1000–01, 88 L.Ed. 1250 (1944) (relief available where party took affirmative action to mislead the court). Accordingly, the Court finds that there is no evidence of a "fraud upon the court," and a motion to vacate or modify the consent decree pursuant to Rule 60(b)(6) is due to be denied.

## II. STANDING

■ Defendant's assertion that the plaintiff class lacked standing merits more serious consideration. The "judicial power" conferred to United States federal courts through Article III of the Constitution extends only to "cases" and "controversies." *See* U.S. Const. art. III, § 2; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). "Standing" is a doctrine which has been developed, in part, to identify those disputes which are "cases" or "controversies" within the meaning of the Constitution. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). As such, "standing" is a constitutionally-mandated jurisdictional requirement. *See Alabama Freethought Ass'n v. Moore,* 893 F.Supp. 1522, 1530 (N.D.Ala.1995). It is necessary, therefore, that prior to taking any action in a cause, a federal court determine that the litigant(s) seeking to bring the cause have standing. *See id.* at 560–61, 112 S.Ct. at 2136–37; *Women's Equity Action League v. Bell,* 743 F.2d 42, 43 (D.C.Cir.1984) ("We are obliged to consider on our own motion threshold Article III impediments to the initiation and maintenance of an action. Before we reach the merits of a particular claim we must be assured that these requirements are satisfied.").

■ Although defendant fails to specify the provision of Rule 60(b) under which it seeks to proceed, the Court presumes that defendant raises its standing argument under Rule 60(b)(4). This section of Rule 60 allows a party to attack a judgment on the ground that it is "void." A judgment is "void" under 60(b)(4) " 'if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law." *Antoine v. Atlas Turner, Inc.,* 66 F.3d 105, 108 (6th Cir.1995) (quoting *In re Edwards,* 962 F.2d 641, 644 (7th Cir.1992)). As standing is a jurisdictional prerequisite, it follows that if the plaintiff class defined in the consent decree lacked standing, the decree may be subject to attack under 60(b)(4) as "void." *See, e.g., Page v. Schweiker,* 786 F.2d 150, 153–54 (3d Cir.1986) (noting that lack of standing could be raised in 60(b) motion); *Presidential Life Ins. Co. v. Milken,* 946 F.Supp. 267, 279–80 (S.D.N.Y.1996) (attacking judgment under 60(b)(4) on claim that plaintiff class lacked standing).

■ Technically, a Rule 60(b)(4) motion must be made "within a reasonable time." However, because subject-matter jurisdiction is a fundamental prerequisite to a court's exercise of authority, a 60(b)(4) motion is not subject to any time constraint. *Hertz Corp. v. Alamo Rent–A–Car,* 16 F.3d 1126, 1130–31 (11th Cir.1994); *see also United States v. Hays,* 515 U.S. 737, ——, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (question of standing is not subject to waiver); *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982) (party cannot waive the requirement of subject-matter jurisdiction by failing to challenge court's jurisdiction early in the proceedings).

■ Although a 60(b)(4) motion may be made at any time, "[i]n the interest of finality, the concept of setting aside a judgment on voidness grounds is narrowly restricted." *V.T.A. v. Airco, Inc.,* 597 F.2d 220, 225 (10th Cir.1979) (footnote omitted). Therefore, not every error in the exercise of jurisdiction will serve as grounds for relief under 60(b)(4). "[O]nly where there is a plain usurpation of power, when a court wrongfully extends its jurisdiction beyond the scope of its authority" will a jurisdictional error be corrected through a 60(b)(4) motion. *Kansas City Southern Ry. Co. v. Great Lakes Carbon Corp.,* 624 F.2d 822, 825 (8th Cir.), *cert. denied,* 449 U.S. 955, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). This situation must be

distinguished from that in which a court mistakenly interprets its own jurisdiction. As federal courts unquestionably have "jurisdiction to determine jurisdiction," *id.* (quoting *Stoll v. Gottlieb*, 305 U.S. 165, 171, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938)), when a court merely commits an error in the exercise of that power, it does not plainly "usurp" jurisdiction, *Nemaizer*, 793 F.2d at 65. It is "only when there is a 'total want of jurisdiction' and no arguable basis upon which [the court] could have rested a finding that it had jurisdiction," that a 60(b)(4) motion must be granted. *Id.* (citation omitted); *see also V.T.A.*, 597 F.2d at 224–25 (10th Cir.); *United States v. Holtzman*, 762 F.2d 720, 724 (9th Cir.1985) (erroneous judgment not a blatant usurpation of power); *Kansas City Southern Ry. Co.*, 624 F.2d at 825 ("[P]lain usurpation of power occurs when there is a 'total want of jurisdiction' as distinguished from 'an error in the exercise of jurisdiction.'") (8th Cir.); *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir.1995); *Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 850 n. 6 (5th Cir.1990); *In re United States Catholic Conference v. Baker*, 824 F.2d 156, 165 (2d Cir. 1987), *rev'd*, 487 U.S. 72, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988); *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir.1995); *Lubben v. Selective Service System Local Board No. 27*, 453 F.2d 645, 649–50 (1st Cir.1972).[12]

■ Accordingly, the question becomes whether there is a colorable basis upon which to conclude that the plaintiff class, as defined in the consent decree, had standing. *See Milken*, 946 F.Supp. at 280. The doctrine of standing encompasses both constitutional limitations on federal court jurisdiction, i.e., the "case" or "controversy" requirement of Article III, and prudential limitations on a court's exercise of that jurisdiction, e.g., the requirement that a plaintiff's grievance fall within the "zone of interest" protected by the statute or constitutional right invoked, the principle that courts should avoid deciding generalized grievances and the requirement that a litigant assert his or her own rights or interests and not those of a third party. *Bennett v. Spear*, — U.S. —, —, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997); *see also Hill v. Butterworth*, 941 F.Supp. 1129, 1137 (N.D.Fla.1996) (listing prudential limitations on standing). Here, defendant asserts that the plaintiff class did not satisfy the constitutional requirements necessary to invoke the Court's jurisdiction, and thus, the Court will focus its discussion on the consti-

---

**12.** Some courts have held that the propriety of a 60(b)(4) motion should be considered in light of the principle of res judicata. For example, in *Picco v. Global Marine Drilling Co.*, 900 F.2d 846 (5th Cir.1990), the court stated:

> A court's determination of its own jurisdiction is subject to the principles of res judicata; it generally may not be challenged in a collateral proceeding. This bar applies whenever the party challenging the judgment has the opportunity to raise the jurisdictional issue but fails to do so. . . .
> We agree [that this approach should be applied in the context of a 60(b)(4) motion], at least where, as here the challenging party was before the court when the order in question was entered and had notice of it and had a full and fair, unimpeded opportunity to challenge it, and the court's jurisdiction, by appeal. Therefore, Picco is now barred from challenging the court's jurisdiction in a Rule 60(b)(4) proceeding.

*Id.* at 850 (citations omitted) (footnote omitted); *see also Mitchell v. Comm'n on Adult Entertainment Establishments of State of Delaware*, 12 F.3d 406, 409 (3d Cir.1993) (noting that doctrine of res judicata appears applicable to 60(b)(4) motion); *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir.1986) ("Even if a court does not expressly rule on matters relating to its exercise of jurisdiction, if the parties could have challenged the court's power to hear a case, the res judicata principles to bar them from later challenging it collaterally."); *Vecchione v. Wohlgemuth*, 426 F.Supp. 1297, 1309 n. 26 (E.D.Pa.), *aff'd*, 558 F.2d 150 (3d Cir.), *cert. denied*, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977) ("A court has the same jurisdiction to determine its jurisdiction whether its judgment is attacked collaterally or directly, and the test of whether a judgment should be reopened after the time for appeal has passed should in all important respects be the same in both situations."). It appears, however, that these courts would not apply the principle of res judicata when the court's exercise of jurisdiction implicates a clear usurpation of power. *See Picco*, 900 F.2d at 850 n. 6; *Nemaizer*, 793 F.2d at 65; *Presidential Life Ins. Co. v. Milken*, 946 F.Supp. 267, 279–80 (S.D.N.Y.1996). Therefore, these courts' reference to the principle of res judicata may be a distinction without a difference. Moreover, although the Eleventh Circuit has not squarely addressed the issue, it appears doubtful that it would adopt a res judicata approach when analyzing 60(b)(4) motions. *See Hertz Corp. v. Alamo Rent–A–Car, Inc.*, 16 F.3d 1126, 1130–31 (11th Cir.1994) (discussing timeliness of 60(b)(4) motion).

tutional rather than the prudential limitations of the standing doctrine.

In *Bennett*, the Court summarized the constitutional requirements of standing:

> [The] "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at ——, 117 S.Ct. at 1163 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)). Plaintiffs bear the burden of establishing each of these elements. *Id.* A nexus exists between the evidence necessary to satisfy this burden and the stage of litigation at which the challenge is made. The *Lujan* Court explained:

> [E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

504 U.S. at 561, 112 S.Ct. at 2137 (citations omitted).

Under the circumstances of the present case, the degree and manner of evidence necessary to sustain plaintiffs' burden is unclear. The final judgment in this case is the product of a consent decree between the parties. The case was never tried. Although defendant unsuccessfully contested plaintiffs' motion for class certification, implicitly challenging plaintiffs' standing, *see* 7B Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 1785.1 at 139 ("both standing and mootness frequently appear as threshold requirements for the maintenance of federal class actions"), defendant did not, until now, challenge the standing of the "expanded" plaintiff class defined in the consent decree. Clearly then, plaintiffs' burden is something less than that which would be required if the case had proceeded to trial, but it is unclear whether plaintiffs' burden should be similar to that faced on a motion for summary judgment or should be that of the more lenient motion to dismiss standard.

The Eleventh Circuit's decision in *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir.1994), is instructive. In *Church*, plaintiffs sought, and were granted, a preliminary injunction. *Id.* at 1335. The defendant filed an interlocutory appeal raising for the first time the question of whether plaintiffs had standing. *Id.* at 1336. The Court noted that while defendant's failure to raise the standing issue earlier did not bar the challenge, it would have an effect on plaintiffs' evidentiary burden. *Id.* The court stated:

> It is not unfair to require every plaintiff to file a complaint which contains sufficient allegations of standing and to prove standing at trial. It might well be unfair, however, to impose a standing burden beyond the sufficiency of the allegations of the pleadings on a plaintiff seeking a preliminary injunction, unless the defendant puts the plaintiff on notice that standing is contested.

*Id.* The court held, therefore, that plaintiffs' standing would be "judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint." *Id.* Thus, it appears that the Court must consider the

equities to determine plaintiffs' evidentiary burden in the unusual procedural posture of this case.

The Court has been unable to find any decision discussing plaintiffs' burden in the specific circumstances present here. However, a number of courts have discussed the inequity of reopening a consent decree. In *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657 (1st Cir.1990), the court stated, "we are particularly reluctant to reopen decrees entered by consent because in making such agreements the parties have voluntarily and consciously decided not to contest the legal and factual elements of the case." *Id.* at 660. In *Vecchione v. Wohlgemuth*, 426 F.Supp. 1297 (E.D.Pa.1977), the court observed that a defendant who enters into a consent decree, "obviate[s] any possible need on plaintiff's part to seek to prove affirmatively her standing." *Id.* at 1309. The *Vecchione* Court found that because there was no manifest defect in subject matter jurisdiction on the face of the record, the defendant's failure to raise the issue of standing until nearly three years after the entry of the consent decree was a sufficient basis to deny defendant's motion. *See id.* at 1308–09. Finally, in *Mitchell v. Comm'n on Adult Entertainment Establishments of the State of Delaware*, 12 F.3d 406 (3d Cir.1993), the court held that a defendant who voluntarily implements a judgment to secure concessions from the opposing party, "affirmatively accept[s] that judgment, including the authority of the district court to enter it." *Id.* at 409.

◼ Here, by electing to enter the consent decree rather than to proceed to trial, defendant obviated plaintiffs' need to establish through affirmative evidence that they had standing. By entering the consent decree, defendant secured numerous concessions from plaintiffs and prevented "devastating" facts from coming out at trial. Moreover, defendant failed to contest plaintiffs' standing until more than five years after the parties jointly submitted the consent decree to the Court. Under these circumstances, it would be "unfair" to impose the higher evidentiary burden on plaintiffs. Therefore, the Court will look to the allega-

tions of the complaint as well as to any favorable evidence adduced at preliminary hearings to judge plaintiffs' standing.

Defendant contends that the plaintiff class lacked standing because they could not demonstrate "injury in fact" and because there was no connection between any injury and the conduct of the defendant. Specifically, defendant asserts that children who were "at high risk of developing emotional or behavioral problems," Consent Decree at ¶ 7(c), and those who were "at imminent risk of placement into foster care and/or DHR custody," Consent Decree at ¶¶ 7(a)-(c), did not have standing to maintain this suit.

Initially the Court must decide whether, assuming defendant's contention is correct and those class members identified above lacked standing, the Court lacked jurisdiction over the case such that the judgment is "void." The Court undertakes this inquiry in light of the principle that, " '[i]n the sound interest of finality, the concept of void judgment must be narrowly restricted.' " *Broyhill Furniture Indus., Inc.*, 12 F.3d at 1084 (quoting James W. Moore & Jo Desha Lucas, Moore's Federal Practice ¶ 60.25[2] at 60–225 (2d ed.1993)). There is no doubt whatsoever that some plaintiffs in the plaintiff class had standing. Defendant's claim applies only to those plaintiffs on the outer edge of the plaintiff class—children at "imminent risk" of entering the custody of DHR and children who have a high probability of developing emotional and behavioral disorders. Children in the custody of DHR who suffer from emotional or behavioral disorders clearly had standing to bring this suit. In fact, the Court has already found as much as these latter plaintiffs essentially made up the class certified by the Court.[13]

◼ A properly defined class includes only those persons who have standing to bring suit in their own right. *Pottinger v. City of Miami*, 720 F.Supp. 955, 957 (S.D.Fla.1989); *Slaughter v. Levine*, 598 F.Supp. 1035, 1041 (D.Minn.1984). A class defined too broadly should not be certified. However, when a plaintiff with standing (as R.C. clearly had) seeks to represent a class

---

**13.** During oral argument Attorney General Pryor    admitted that the certified class had standing.

defined too broadly (i.e., when some members of the plaintiff class lack standing) a court need not dismiss the case for lack of jurisdiction. Instead, the court should either reform the class, limiting it to those persons who have standing, *see, e.g., Kister v. Ohio Bd. of Regents*, 365 F.Supp. 27, 33–34 (S.D.Ohio 1973), *aff'd*, 414 U.S. 1117, 94 S.Ct. 855, 38 L.Ed.2d 747 (1974), or allow the named plaintiff(s) to proceed individually, permitting others with like claims to request joinder, *see, e.g., Swain v. Brinegar*, 517 F.2d 766, 779–80 (7th Cir.1975).

In light of these principles, the Court finds that even if defendant were correct and some members of the plaintiff class lacked standing, the judgment of the Court, i.e., the consent decree, is not void for want of jurisdiction. It was clear that some, if not all, members of the plaintiff class had standing. There was a live case or controversy before the Court and there is no question that the Court had jurisdiction to order the relief encompassed in the consent decree.[14] The Court's error, if any, was that by entering the consent decree with an expanded class definition, the Court implicitly certified an overly-broad plaintiff class. The Court finds that this error, if an error, does not amount to a "plain usurpation of power." Accordingly, the Court finds that the consent decree is not due to be vacated as "void" under Rule 60(b)(4).

Moreover, defendant's argument fails on a second ground: there exists a colorable basis upon which to conclude that the entire plaintiff class had standing. The allegations in the complaint and the evidence adduced by the plaintiffs established that all members of the plaintiff class suffered or would suffer injury-in-fact directly traceable to the conduct of the defendant. Plaintiffs alleged that DHR improperly removed class members from their homes. Plaintiffs claimed that DHR's failure to provide both in-home and community-based services and support led to the otherwise unnecessary removal of plaintiffs from their homes. Further, plaintiffs alleged that once they have been removed from their homes, DHR failed to provide the services and support which would facilitate family reunification. Comp. at ¶¶ 39–41. Plaintiffs alleged that once in the custody of DHR, DHR systematically placed them in inappropriate institutional settings. Comp. at ¶ 41. In these settings, plaintiffs received improper or inappropriate treatment and support which led to emotional and psychological injury. Comp. at ¶ 35–36, 38.

The evidence adduced at the class certification hearing was consistent with plaintiffs' allegations. One witness stated that the complaint correctly identified the "systemic failings" of DHR. DHR's Director of the Division of Family and Children Services estimated that caseloads were twice the national average, noted that it was not uncommon for children to wait six to eight months to be placed in the appropriate treatment facility and concluded that DHR was not "adequately meeting [the children's] needs." *See* Magistrate's Recommendation on class certification entered June 16, 1989.

Among the most damaging evidence was the report of the Governor's Special Commission on Child Welfare Services. This report stated that children were too often removed from their families because of inadequate support resources, that emotionally and behaviorally disturbed children were placed in overly restrictive institutional settings and that these children had to wait for long periods of time before receiving necessary services. The report concluded that *"the State of Alabama has failed on a long-term basis to fulfill its legal and moral obligations to its abused and neglected children."*

Prior to the fairness hearing, plaintiffs offered additional evidence of injury in the form of expert affidavit testimony. Plaintiffs' first expert testified that DHR (1) fails to make reasonable efforts to prevent children from being removed from their families; (2) fails to make reasonable efforts to return children to their families; (3) fails to provide children in its custody with proper care, treatment and services; and (4) places children in inappropriate residential and institutional settings. *See* aff. of Dr. Margaret

**14.** *See* discussion *infra*, part III.

Beyer in "Plaintiffs' exhibits from the record in connection with hearing on defendant's motion to vacate or modify" ("plaintiffs' exhibits") at Tab 11. Plaintiffs' second expert echoed the sentiments of the first and stated specifically that, "[a]t least one-third to one-half of children currently being removed could safely and effectively receive the services they need at home." Aff. of George E. Taylor in plaintiffs' exhibits at Tab 11.

■ A plaintiff need not wait for an injury to occur to satisfy the "injury-in-fact" requirement of standing. A future injury will suffice as long as that injury is "imminent" or "real and immediate" and not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136; *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03, 103 S.Ct. 1660, 1665–66, 75 L.Ed.2d 675 (1983). The Court finds it helpful to divide the concept of "imminence" into two components, probability and timeliness.[15] An injury will be "imminent" if it is both highly probable and temporally near.

The probability aspect of "imminence" is illustrated by the Supreme Court's decision in *Lyons*. In *Lyons*, the plaintiff sought injunctive relief to prohibit the use of "chokeholds" by police officers. 461 U.S. at 98, 103 S.Ct. at 1663. The Court's standing inquiry focused on the probability of future injury. The Court stated, "[plaintiff's] standing to seek the injunction depended on whether he was likely to suffer future injury from the use of chokeholds by police officers." *Id.* at 105, 103 S.Ct. at 1666–67. The Court held that the plaintiff lacked standing because the probability of future injury was too speculative. *Id.* at 106–07, 103 S.Ct. at 1667–68. The Court explained:

In order to establish an actual controversy in this case, [the plaintiff] would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter ... or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 105–06, 103 S.Ct. at 1667 (emphasis in original).

Future injury which is dependent on the random and/or unauthorized acts of a third party is highly speculative. This was the case in *Lyons;* the Court found it highly doubtful that police officers would illegally choke the plaintiff in the future. However, when the acts which will cause injury are authorized or part of a policy, it becomes far more reasonable to assume those acts will occur. Thus, the *Lyons* Court observed that the plaintiff may have had standing if he had alleged "that the City ordered or authorized police officers to [perform illegal chokeholds]." *Id.* at 106, 103 S.Ct. at 1667; *see also Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir.1994) (likelihood of future injury is great where there is municipal policy that authorizes constitutional deprivations suffered by plaintiffs); *Bras v. California Pub. Utils. Comm'n*, 59 F.3d 869, 873–74 (9th Cir.1995) (policy of racial classification in award of contracts means that plaintiffs suffer legally cognizable injury at the point they demonstrate ability to bid on contract; plaintiffs need not wait to be denied contract to have standing), *cert. denied*, — U.S. —, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996); *Tidwell v. Schweiker*, 677 F.2d 560, 565 (7th Cir.1982) (where there was unlawful policy of distributing Social Security disability benefits of persons in mental health institutions, plaintiffs did not have to wait for unlawful act

---

**15.** Where the injury alleged by a plaintiff is one which will occur in the future, the analysis of whether that plaintiff has suffered "injury-in-fact" necessarily converges with a "ripeness" analysis. *See Wilderness Soc'y v. Alcock*, 83 F.3d 386, 390 (11th Cir.1996) (under either analysis, initial question is whether complained of injury is "imminent"). The Eleventh Circuit explained the difference between the two inquiries:

When determining standing, a court asks whether these persons are the proper parties to' bring the suit, thus focusing on the qualitative

sufficiency of the injury and whether the complainant has personally suffered harm. When determining ripeness, a court asks whether this is the correct time for the complainant to bring the action.

*Id.* (citations omitted). To a certain extent, however, the first inquiry subsumes the second. A litigant will not be the proper party to bring a suit if an injury will not be suffered in the immediate future. In such a case, the litigant may lack the motivation, perspective and/or knowledge to be the "proper" party to bring suit.

to occur to have standing), *cert denied,* 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 806 (1983).

Here, the systemic deficiencies in DHR are analogous to an injurious policy. The forces which caused plaintiffs' injuries were not random or speculative. According to the complaint, DHR *systematically* failed to place plaintiffs in appropriate out-of-home residences. As a result, plaintiffs were systematically denied appropriate care and treatment. Plaintiffs also alleged that DHR *systematically* failed to provide plaintiffs with services which would reunite them with their families. These systemic causes of injury leave no doubt that once in DHR custody plaintiffs would suffer injury.

Moreover, plaintiffs' allegations and evidence support the conclusion that plaintiffs suffered injury *immediately* upon entry into DHR custody. One of the injuries alleged by the plaintiffs was unwarranted governmental interference with their families. For many of the plaintiffs, this injury was manifest upon admittance to DHR custody. That is, the unwarranted governmental interference suffered by these plaintiffs was DHR's act of unnecessarily removing them from their families. For the remaining plaintiffs, the injury of unwarranted interference with family stemmed from DHR's systemic failure to provide services and placements which would facilitate family reunification. Because the failures were systemic, it can be presumed that plaintiffs were denied these necessary services from the time they entered DHR custody. Therefore, the Court can reasonably conclude that all plaintiffs entering DHR custody immediately suffered injury.

The question becomes then, whether children at "imminent risk" of entering a system where they will immediately suffer injury have injury-in-fact. This brings the Court to the timeliness aspect of the injury-in-fact inquiry. The Supreme Court explored this aspect of injury-in-fact in *Lujan.*

The *Lujan* plaintiffs, organizations dedicated to the preservation of wildlife, sued the Secretary of the Interior over regulations promulgated pursuant to the Endangered Species Act. *Lujan,* 504 U.S. at 559, 112 S.Ct. at 2135–36. Plaintiffs claimed that the regulations would increase the rate at which certain endangered species found in foreign countries would perish. *Id.* at 562, 112 S.Ct. at 2137. Plaintiffs desired, among other things, to observe the animals whose extinction would be hastened by the new regulations. *Id.* at 563, 112 S.Ct. at 2137–38. The Court agreed that if the plaintiffs were unable to observe the animals they would suffer a cognizable injury, but held that plaintiffs would have to be physically present in the foreign country where they could view the endangered species to suffer "injury-in-fact." *Id.* at 563, 112 S.Ct. at 2137–38. The Court then questioned when, if ever, the plaintiffs would be in those foreign countries so that they could personally observe the animals:

> [T]he [plaintiffs'] profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

*Id.* at 564, 112 S.Ct. at 2138. The Court held that to have standing, plaintiffs had to demonstrate that their injury would "proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.* at 564 n. 2, 112 S.Ct. at 2138 n. 2.

Exactly how "immediate" an injury must be to constitute "imminent" injury-in-fact is a question to which there is no precise answer. *Lujan* makes it clear that the injury cannot be one that will be suffered at "some time" in the future. However, a plaintiff need not demonstrate that injury will occur within days or even weeks to have standing. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211–13, 115 S.Ct. 2097, 2105, 132 L.Ed.2d 158 (plaintiff who was likely to suffer injury within one year period had standing to sue). Rather than a quantitative limitation, the timeliness aspect of "injury-in-fact" requires the Court to make a qualitative assessment of plaintiffs' alleged injuries to insure that they are not so distant as to be

speculative or indefinite. *See Wilderness Soc'y v. Alcock,* 83 F.3d 386, 390 (11th Cir. 1996) (when determining standing court focuses on qualitative sufficiency of the injury).

Fortunately, here the Court does not have to struggle with the vague contours of the timeliness inquiry. The plaintiff class is defined to include only those children at "imminent" risk of entering DHR custody. The Court can reasonably presume that the term "imminent" is intended to comport with the Supreme Court's conceptualization of injury-in-fact. In other words, the plaintiff class included only those children who would enter DHR custody within a short and definite period of time. The Court has already found that plaintiffs suffered injury immediately upon entry into DHR custody. Hence, the plaintiffs at "imminent risk" of entering DHR custody were children who would, in the immediate future, enter a system where they would immediately suffer injury. The Court can reasonably conclude that such plaintiffs demonstrated injury-in-fact.[16]

The Court can also reasonably conclude that plaintiffs' allegations and evidence demonstrated that children at high risk of developing emotional and behavioral problems, who were either in DHR custody or at imminent risk of entering DHR custody, suffered injury-in-fact. The evidence of injury adduced by plaintiffs was not limited to children already suffering emotional or behavioral disorders. The Governor's Special Commission on Child Welfare Service's, for example, found that DHR failed to provide appropriate placements for children in its custody, that DHR failed to provide appropriate services to prevent removal of children from their families and that DHR failed to provide appropriate services to facilitate family reunification. The evidence of systemic deficiencies throughout DHR suggested that *all* children in, or at imminent risk of entering, DHR custody had injury-in-fact. Accordingly, the Court finds that the entire plaintiff class, as defined in the consent decree, suffered injury-in-fact.

Defendant's second basis for claiming that the plaintiff class lacked standing is that there was no connection between the plaintiffs' injuries and the conduct of defendant. This contention, however, is wholly without merit. Plaintiffs had to establish that their injuries were "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett,* —— U.S. at ——, 117 S.Ct. at 1163. According to the complaint, defendant's failure to provide appropriate placement, services, treatment and care caused plaintiffs' injuries. Plaintiffs' allegations and evidence clearly established that their injuries were related to the conduct of the defendant. The defendant has not suggested nor is the Court able to surmise what third party could have been responsible for the plaintiffs' injuries. Therefore, the Court finds that the injuries suffered by the plaintiffs are fairly traceable to the conduct of the defendant. Accordingly, the Court finds that the plaintiff class, as defined in the consent decree, has standing to sue. A 60(b)(4) motion to vacate or modify the judgment on the grounds that the plaintiff class lacks standing is, therefore, due to be denied.

## III. SIGNIFICANT CHANGE IN LAW

Defendant's final basis for seeking to vacate or modify the consent decree is the claim that there has been a significant change in the law upon which the consent decree was premised. Defendant contends that paragraphs 31 through 63 of the consent decree are attributable to plaintiffs' claims in Count III of the complaint, claims made under the Adoption Assistance and Child Welfare Act ("AACWA"), 42 U.S.C. ¶ 601 *et seq.* According to defendant, in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court held that no private cause of action may be maintained under the AACWA. Defendant concludes, therefore, that the consent decree, or at least paragraphs 31 through 63 thereof, must be vacated.

---

**16.** The Court reiterates that there need only be a colorable basis upon which to conclude the plaintiff class had standing for the Court to deny defendant's motion under Rule 60(b)(4). *See* discussion *supra* pp. —— - ——.

In *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Court held that a consent decree is subject to modification under Rule 60(b)(5) of the Federal Rules of Civil Procedure in the event of changed legal or factual circumstances. The Court stated, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* at 383, 112 S.Ct. at 760. Modification based on a change in law can be either mandatory or permissive. "A consent decree *must* ... be modified if ... one or more of the obligations placed upon the parties has become impermissible under federal law. But modification of a consent decree *may* be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id.* at 388, 112 S.Ct. at 762 (emphasis added).

However, before reaching the merits of defendant's substantive claim, Rule 60(b)(5) requires that the Court determine whether defendant's motion was made within a "reasonable time." See *Nucor Corp. v. Nebraska Pub. Power Dist.,* 999 F.2d 372, 374–75 (8th Cir.1993) (holding that it was abuse of discretion for district court to reach merits of untimely Rule 60(b)(5) motion). Because defendant's motion is premised on an alleged substantial change in law, the Court must determine whether defendant filed its motion within a reasonable time after the purported change in law occurred. *See Gilbert v. Dresser Indus., Inc.,* 158 F.R.D. 89, 95 (N.D.Miss.1993).

The reasonableness of a movant's delay in filing a 60(b)(5) motion is dependent upon the facts of each case. The general inquiry to be made by the Court is whether the movant has offered a "good reason" for his or her delay in filing and what, if any, prejudice the non-movant will suffer if the judgment is reopened. *E.g., Schultz v. Commerce First Fin.,* 24 F.3d 1023, 1025 (8th Cir.1994); *United States v. Holtzman,* 762 F.2d 720, 725 (9th Cir.1985); *Harduvel v. General Dynamics Corp.,* 801 F.Supp. 597, 603 (M.D.Fla. 1992). Additionally, the Court may consider any extraordinary circumstances weighing for or against reaching the merits of the 60(b)(5) motion. *See Washington v. Penwell,* 700 F.2d 570, 573 (9th Cir.1983); *Dresser Indus., Inc.,* 158 F.R.D. at 96.

Here the change in law upon which defendant purports to rely stems from the Supreme Court's decision in *Suter v. Artist M.,* entered March 25, 1992. Defendant filed its motion to vacate or modify the consent decree on July 29, 1996. Thus, defendant waited more than four years before seeking 60(b) relief from the Court. Defendant has offered no reason for this delay. In fact, at no time, either in its written motion or during oral argument, did defendant even discuss the timeliness of its motion. Furthermore, the Court is unable to discern from the record any plausible reason for defendant's lengthy delay in filing.

As discussed earlier, if the judgment in this case is reopened plaintiffs will be substantially prejudiced. According to defendant's own counsel, this case "pose[d] a clear victory for the plaintiffs." Plaintiffs gave up this clear victory when they entered into the consent decree. In doing so; plaintiffs gave up "some things to which [they] believed [they] were entitled or which [they] believed [they] may have achieved from further litigation." Consent Decree at 1 n. 1. In return, plaintiffs obtained some concessions from defendant which they might not have been able to obtain had they gone to trial. If plaintiffs are forced to try this case now, they may not be able to amass once again the "devastating" evidence which previously had them on the brink of victory. Because of the substantial time which has passed, plaintiffs would essentially be forced to begin from scratch. More importantly, plaintiffs would, at least during the pendency of the litigation, lose the health and safety protections which the consent decree provides. DHR's return to preconsent decree conditions could, and probably would, have dire consequences for Alabama's abused and neglected children. Finally, even if plaintiffs were to prevail at a trial on the merits, the relief they would obtain is uncertain. Certainty in relief was perhaps the primary reason plaintiffs decided to forego a trial on the merits and instead join in the consent decree.

The Court is aware of no extraordinary circumstance militating in favor of reaching the merits of defendant's 60(b)(5) motion. To the contrary, the equities of this case make the timing of defendant's motion appear that much more unreasonable. The defendant filed this motion only after all the benefits of settlement had inured to its favor. The defendant offered no explanation for its delay. The only reason that the Court can fathom for the defendant's tardy filing is a shift in the political winds. Such maneuvering does not warrant the Court's indulgence. See *Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, No. 87 C 9853, 1993 WL 524226, at *2 (N.D.Ill.Dec.10, 1993) (finding that 60(b) motion not filed within a reasonable time where defendant waited to file until such time as was strategically expedient). Accordingly, the Court finds that defendant's argument that the consent decree should be vacated or modified because of a significant change in law is foreclosed by defendant's unreasonable delay in filing. *See V.T.A.*, 597 F.2d at 224 (district court's finding that sixteen-month delay was unreasonable was not an abuse of discretion); *Hallmark Cards, Inc. v. JTK Corp.*, No. CV–88–3890, 1992 WL 118805, at *2 (E.D.N.Y. May 20, 1992) (three-year delay unreasonable); *McCloud v. Lawrence Gallery, Ltd.*, No. 90 Civ. 30, 1992 WL 6199, at *2 (S.D.N.Y. Jan. 9, 1992) (two-year delay in filing 60(b)(5) motion unreasonable), *aff'd*, 970 F.2d 896 (2d Cir.1992); *Fidelity State Bank, Garden City, Kan. v. Oles*, Civ. A. No. 89–1043–T, 1991 WL 105614, at *2 (D.Kan. May 23, 1991) (finding that two-year delay in filing unreasonable where defendant offers no explanation).

Even if defendant had timely filed its motion, the Court would not grant defendant relief based upon its significant change in law argument. Defendant contends that the Court *must* reform the consent decree because after *Suter*, certain provisions of the consent decree are impermissible under federal and/or constitutional law. Assuming arguendo that after *Suter*, plaintiffs can no longer maintain a private cause of action under the AACWA, but see 42 U.S.C. § 1320a–2 (discussing applicability of *Suter* rationale to private enforcement of sections of the AACWA other than § 671(a)(15)), de-

fendant's conclusion that the consent decree imposes *impermissible* obligations on the defendant, is, nevertheless, mistaken. Defendant's error is revealed by close examination of the very cases it relies upon to support its argument.

In *Rufo*, prisoners in the Suffolk County Jail sued the county sheriff and Massachusetts Commissioner of Corrections claiming that they were being detained under unconstitutional conditions. Eventually, the district court entered a consent decree which required, inter alia, that defendants build a new jail consisting of single occupancy cells. The sheriff moved under Rule 60(b)(5) to modify the consent decree to permit the double-ceiling of prisoners. The district court denied the sheriff's motion, *Inmates of Suffolk County Jail v. Kearney*, 734 F.Supp. 561, 564–65 (D.Mass.), and the appellate court affirmed, 915 F.2d 1557 (1st Cir.1990).

■ The sheriff argued that the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), mandated modification of the decree. In *Bell* the Court held that double-ceiling of prisoners is not in all cases unconstitutional. *Id.* at 541–43, 99 S.Ct. at 1875–76. In response to the sheriff's argument, the Supreme Court noted that although *Bell* made clear that single-ceiling was not constitutionally required, *Bell* "surely did not cast doubt on the legality of single ceiling." *Rufo*, 502 U.S. at 388, 112 S.Ct. at 762. Only this latter point was relevant to the Court's analysis of whether, after *Bell*, modification of the consent decree was *mandatory*. As single-ceiling was the disputed requirement in the consent decree, the Court's inquiry focused on whether *Bell* had made that requirement impermissible. The Court stated:

Neither *Bell* nor the Federal Constitution forbade [single-ceiling]. Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated. But we have no doubt that, to "save themselves the time, expense, and inevitable risk of litigation," petitioners could settle the dispute over

the proper remedy for the constitutional violations that had been found by undertaking to do more that the Constitution itself requires.... but also more than what a court would have ordered absent the settlement.

*Id.* at 389, 112 S.Ct. at 763 (citations omitted). Thus, *Rufo* makes clear that a consent decree need not be modified simply because its requirements exceed constitutional or federal statutory minimums.

In *Suter*, the Court was faced with the question of whether plaintiffs could maintain a private cause of action under the AACWA. 503 U.S. at 350, 112 S.Ct. at 1363. The plaintiffs argued that the question was foreclosed because the defendant had agreed, in a consent decree entered in a parallel case, to undertake certain activities mandated by the AACWA. Id. at 354 n. 6, 112 S.Ct. at 1365 n. 6. The Court held that the issue was not foreclosed because the *Suter* parties were not parties to the consent decree and because the consent decree did not determine the underlying legal issue. *Id.* Notably, however, the Court distinguished the *Suter* parties' legal rights from the rights of the parties to the consent decree, by stating "parties may agree to provisions in a consent decree which exceed the requirements of federal law." *Id.* (citing *Rufo,* 502 U.S. at 389, 112 S.Ct. at 762–63).

■ The implication of this statement is that a consent decree may contain obligations related to the AACWA despite the fact that the AACWA cannot be privately enforced. Although the Court did not have the issue squarely before it, the Court clearly contemplated that a consent decree with provisions relating to the AACWA was not *impermissible* in light of its decision. If the Court's decision had made such provisions *impermissible* the Court surely would not have observed that parties to the consent decree could agree to such provisions because they exceeded the requirements of federal law. Such an observation would have been illogical in light of the Court's statements regarding mandatory modification.[17] *See* 502 U.S. at

388, 112 S.Ct. at 762. Accordingly, the Court finds that the Supreme Court's decision in *Suter* did not make the provisions of the consent decree which relate to the AACWA *impermissible* under constitutional or federal statutory law.

Moreover, although the relief in ¶¶ 31–63 of the consent decree may relate to the AACWA, it also clearly relates to the vindication of plaintiffs' other claims. For example, paragraph 33 of the consent decree, which sets forth the "goals" of the decree, states, in part, that class members shall "live with their families, and when that cannot be achieved through the provision of services, [ ] live near the home." There is a clear connection between this goal and plaintiffs' claim to be free from unwarranted governmental interference with their families. The consent decree proclaims that the "system of care," which is set out in paragraphs 34–63 of the decree, is to be administered to achieve the parties' goals. Among the principles and standards in the "system of care" are numerous provisions relating to family maintenance and reunification and to the proper care, treatment and services for class members. In essence, the consent decree proscribes unwarranted governmental interference with class members' families, prescribes appropriate care treatment and services for class members and then sets forth a method for achieving these objectives. That this method "borrows" from the AACWA in no way diminishes the substantial connection between the relief provided in the consent decree and plaintiffs' constitutional and Rehabilitation Act claims. Because the relief in ¶¶ 31–63 of the consent decree is not *impermissible* under constitutional or federal statutory law and because the relief found in these paragraphs clearly relates to the vindication of *all* of plaintiffs' claims, the Court finds that defendant's request for mandatory modification of the consent decree is due to be denied. *See Rufo,* 502 U.S. at 389, 112 S.Ct. at 762–63 (district court did not abuse discretion in entering consent decree whose provisions exceeded the requirements of federal statutory

---

**17.** *Rufo* was decided January 15, 1992; *Suter* was decided March 25 of the same year. Therefore, the *Suter* Court's decision was undoubtedly

informed by the *Rufo* Court's discussion of mandatory modification of institutional consent decrees.

and constitutional law where the relief provided clearly related to the conditions found to offend the Constitution).

■ Furthermore, the court finds that the circumstances of this case do not warrant the exercise of the Court's inherent power to modify the decree. *See Cook v. Birmingham News,* 618 F.2d 1149, 1151 (5th Cir.1980) (Rule 60(b)(5) is codification of court's inherent power to modify injunction in adaptation to changed conditions). In *Rufo,* the Court identified two situations where modification of a consent decree may be warranted. The first occurs when the law changes to make legal that which the decree was designed to prevent. *Rufo,* 502 U.S. at 388, 112 S.Ct. at 762. Second, where the consent decree is a product of the parties' misunderstanding of the governing law, modification of the decree may be in order. The Court finds, however, that neither of these situations exists in this case.

Systemic deficiencies throughout DHR gave rise to the plaintiffs' injuries. Specifically, DHR unnecessarily removed children from their homes, made inadequate efforts to promote family reunification and provided inappropriate care, treatment and services to the plaintiff class. The consent decree was designed to cure these deficiencies and, thus, prevent further injury to plaintiffs. The Court is quite certain that since the entry of the consent decree the law has not changed to make these systemic deficiencies legal or acceptable. Therefore, the "significant change of law" in the instant case does not warrant modification of the consent decree under the first *Rufo* situation. *Cf. System Federation No. 91, Railway Employees Dept., AFL-CIO v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (consent decree which prohibited discrimination against non-union employees was modified when law was amended to allow union shops to operate in industry).

The Court also finds that this case does not fit the second *Rufo* "permissive" modification situation. The only possible "misunderstanding" in this case pertains to plaintiffs' rights and defendant's obligations under the AACWA. However, as noted above, the AACWA forms the basis for only one of plaintiffs' four claims. There is no indication that the parties' decision to enter the consent decree was based solely, or even primarily, on the strength of plaintiffs' claim under the AACWA. Also as discussed above, the relief provided in the consent decree relates to all of plaintiffs' claims, not just plaintiffs' claim under the AACWA. Thus, even if the parties utilized the AACWA to shape the relief embodied in the consent decree, the consent decree cannot be said to be the product of a mistaken understanding of the law. The relief in the consent decree redressed all of plaintiffs' claims and, therefore, the consent decree is as much a product of plaintiffs' constitutional and Rehabilitation Act claims as it is the product of plaintiffs' claim under the AACWA.

Furthermore, it is evident that, from the outset, defendant did not believe that the AACWA provided plaintiffs with a cause of action. In the early stages of litigation defendant moved to dismiss plaintiffs' claim under the AACWA. Although the Court, Judge Dubina presiding, found that plaintiffs could bring a claim under the AACWA, the Court acknowledged that there was no controlling Eleventh Circuit precedent on the question. The Supreme Court's decision to grant certiorari in *Suter* highlighted the unsettled state of the law pertaining to enforcement of the AACWA. The Supreme Court granted certiorari in *Suter* prior to the date the parties consented to entry of the consent decree. Nevertheless, facing not one but four claims supported by overwhelming evidence, the defendant, presumably to " 'save [itself] the time, expense, and inevitable risk of litigation,' " *Rufo,* 502 U.S. at 389, 112 S.Ct. at 762 (quoting *United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)), chose to settle this case by entering into the consent decree. The defendant's decision to enter into the consent decree despite the existence of potentially valid legal defenses is memorialized on the first page of the decree: "defendant ... made concessions that it believed were unnecessary in light of prevailing law." Under these circumstances, the Court finds that the consent decree is not the product of the parties' "misunderstanding of the governing

**704**

law." *Id.* at 390, 112 S.Ct. at 763; *see also Wyatt v. King,* 811 F.Supp. 1533, 1541–43 (M.D.Ala.1993). Accordingly, the Court finds that a 60(b)(5) motion to vacate or modify the consent decree based on a substantial change in law is due to be denied.

## CONCLUSION

Six years is a long time for a federal court to oversee the operation of state affairs. Principles of federalism normally dictate that federal courts give states wide latitude to operate their public institutions as they see fit. Federalism also dictates that a federal court withdraw from the realm of state affairs at the earliest opportunity. This Court is an ardent believer in those principles and would like nothing more than to be free from the immense burden of monitoring DHR's operations. However, when a state refuses to adopt and maintain minimal constitutional, federal statutory and common-law standards in its public institutions the state forces federal involvement. The consent decree in this case came about because DHR would not or could not comply with constitutional, federal statutory and common-law mandates. It is this Court's highest duty to ensure that these mandates are observed. Despite the desired principles of federalism, the Court cannot, and will not, abdicate this duty.

This case is hardly the first time the State of Alabama has thrust the reform of one of its public institutions into the hands of the federal courts. Alabama has a long and well-documented history of federal oversight of its public institutions. *E.g., Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (prohibiting racially discriminatory redistricting); *White v. Alabama,* 867 F.Supp. 1519 (M.D.Ala.1994) (ending discriminatory system of at-large election system); *Lynch v. Baxley,* 386 F.Supp. 378 (M.D.Ala. 1974) (setting minimum constitutional standards and safeguards for involuntary commitment to state mental health institutions); *Wyatt v.* Aderholt, 368 F.Supp. 1383 (M.D.Ala.1974) (establishing constitutionally mandated standards and safeguards for mental health patients facing sterilization); *Newman v. Alabama,* 349 F.Supp. 278 (M.D.Ala. 1972) (mandating constitutionally adequate medical treatment for state prisoners); *NAACP v. Allen,* 340 F.Supp. 703 (M.D.Ala. 1972) (requiring state police to cease and remedy discriminatory employment practices); *Wyatt v. Stickney,* 325 F.Supp. 781 (M.D.Ala.1971) (setting minimal constitutional standards of care and treatment in state mental health institutions); *U.S. by Mitchell v. Frazer,* 317 F.Supp. 1079 (M.D.Ala.1970) (requiring state personnel administering federal grant-in-aid program to cease and remedy discriminatory employment practices); *Marable v. Alabama Bd. of Mental Health,* 297 F.Supp. 291 (M.D.Ala.1969) (ending racial segregation and discrimination in state mental health institutions); *Stockton v. Alabama Indus. Sch. for Negro Children,* Civ. A. No. 2834–N (M.D.Ala.1969) (mandating constitutional standards in the States' Industrial School for Negro Children); *Lee v. Macon County Bd. of Educ.,* 221 F.Supp. 297 (M.D.Ala.1963) (enjoining operation of compulsory biracial school system). In fact, Alabama's practice of forcing federal authorities to monitor state activities has occurred with such frequency that Judge Frank M. Johnson gave it a name: "The Alabama Punting Syndrome." *See* Johnson, *The Alabama Punting Syndrome,* The Judges' J., Spring 1979.

Over the past year the Court has observed the relationship between the parties grow increasingly strained. The Court has also noticed that over this same period DHR has been the subject of substantial negative publicity. The Court believes that these trends stem in part from uncertainty regarding the consent decree—uncertainty as to the decree's continued vitality and uncertainty with regard to the obligations embodied in the decree. Today, however, the Court dispels any uncertainty over the consent decree's continued vitality—it remains a valid order of the Court—and serves notice that the Court will expeditiously resolve any uncertainty, both current and future, regarding the rights and duties within the decree.

The Court does not desire to serve indefinitely as a "super-monitor" for Alabama's child welfare system. The fact is that Alabama has "punted" the reform of this system to the Court and the Court has no choice but

to see that the consent decree is fully implemented. It is evident that the consent decree provides Alabama's abused and neglected children with a measure of health and safety that they would not enjoy in the decree's absence. The Court considers its duty to protect the health and safety of these children to be among its highest callings. Accordingly, the Court will not hesitate to use any and all measures necessary[18] to insure Alabama's compliance with the consent decree.[19]

## ORDER

For the reasons set forth above, it is CONSIDERED and ORDERED that defendant's motion to vacate or modify the consent decree be and the same is hereby DENIED.

It is further CONSIDERED and ORDERED that the United States Marshall personally serve courtesy copies of this Memorandum Opinion and Order on:

(1) Honorable Forrest H. "Fob" James, Governor of Alabama;

(2) Honorable William H. Pryor, Jr., Attorney General of Alabama;

(3) Honorable Martha Nachman, Commissioner of the Alabama Department of Human Resources; and

(4) Honorable Bill Gray, Legal Advisor to Governor James.

18. Among the sanctions that the Court will consider if defendant fails to rapidly make all reasonable efforts to come into compliance are: civil fines, receivership and/or judicially-ordered financing. While the Court does not desire to take such drastic steps, the Court will not back away from its responsibility to the Constitution and to the abused and neglected children of Alabama.

19. The Court appreciates Commissioner Nachman's concern that historically DHR has, under the auspices of "family preservation," allegedly returned abused and neglected children to their homes only for them to suffer further abuse and neglect. The safety of Alabama's children must be DHR's first concern. Once removed, children should not be returned to their homes unless and until all appropriate standards and operating principles are met and regular and frequent inspections are thereafter conducted. The Court would suggest that if a social worker is to err, that he or she should err on the side of safety of the child.