851 So.2d 1 (2002)
STATE DEPARTMENT OF HUMAN RESOURCES
v.
A.K. and S.J.
(In the Matter of S.T.J., B.J., and M.J.)
2001005.
Court of Civil Appeals of Alabama.
April 19, 2002.
Rehearing Applications Denied June 7, 2002.
*2 J. Coleman Campbell, deputy atty. gen., and Sharon E. Ficquette, asst. atty. gen., Department of Human Resources, for appellant.
Christopher F. Abel of Gullahorn & Hare, P.C. Albertville, for appellee A.K.
Mark T. Hopper, Albertville, for appellee S.J.
Thomas B. Woodall of Barnett, Woodall & Baker, Guntersville, guardian ad litem.
James A. Tucker, Southern Poverty Law Center, Montgomery; and Barbara A. Lawrence, Alabama Disabilities Advocacy Program, Tuscaloosa, for amicus curiae "Plaintiff Class in R.C. v. Fuller."
THOMPSON, Judge.
The Department of Human Resources (hereinafter "DHR") filed a petition seeking to terminate the parental rights of A.K. ("the mother") and S.J. ("the father") to their three children. For most of the time since 1996, the children have been with foster families. In April 2001, the trial court conducted a hearing and received ore tenus evidence. On June 5, 2001, the trial court entered a judgment denying DHR's petition to terminate the parents' parental rights and awarding custody of the children to Big Oak Ranch, Inc., a private "residential facility" in St. Clair County. See § 12-15-1(22), Ala. Code 1975 (defining "residential facility" as "[a] dwelling, other than a detention or shelter care facility, providing living accommodations, care, treatment, and maintenance for children, including ... group homes, ... and, where not operated by a public agency, licensed, or approved to provide such care"). We note that Big Oak Ranch is not a party to this action and has not sought to intervene in this appeal.
On June 8, 2001, DHR filed a motion to stay the trial court's judgment. The trial court refused to stay the transfer of custody of the children; however, on July 9, 2001, this court stayed that transfer of custody. The children remain with their foster families.
We note that on June 8, 2001, DHR also filed a postjudgment motion seeking to alter, amend, or vacate the trial court's judgment. On July 6, 2001, the trial court purported to enter an order ruling on that motion; however, because DHR's June 8, 2001, postjudgment motion was denied by operation of law on June 22, 2001, see Rule 4(B), Ala. R. Juv. P., the trial court was without jurisdiction to enter that order. DHR timely appealed from the June 22, 2001, denial of its postjudgment motion.
DHR raises several arguments on appeal. We conclude that DHR's argument that the trial court erred in denying its petition to terminate the parents' parental rights is dispositive of this appeal. Therefore, we do not reach the other issues raised in DHR's brief on appeal.
The mother and father married, and M.J., a daughter who was nine years old at the time of the termination hearing, was born of that marriage. The mother and father divorced, but they subsequently resumed living together. B.J., a daughter, and S.T.J., a son, were born of the relationship; those children were seven and six years old, respectively, at the time of the termination hearing.
*3 In 1996, DHR received a report that S.T.J., who was one year old at the time, had bite marks on his buttocks and that the mother was leaving the three children unsupervised; DHR removed S.T.J. from the mother's home. In November 1996, the trial court entered an order finding that the mother was conducting a relationship with a 16-year-old boy and that while doing so she had failed to supervise M.J. and B.J. The trial court found all three children to be dependent and awarded custody of them to DHR. The children were placed in foster care.
Shortly after the children were taken into protective custody, the father was convicted of, and imprisoned on, felony charges of theft of property, burglary, and escape. The father was sentenced to 15 years in prison. The father was released from prison on parole shortly before the April 2001 termination hearing.
Beginning in 1996, DHR offered the mother a number of family-support services, including a parenting coach and training in budgeting, personal hygiene, home safety, and caring for sick children. At first, the mother made progress toward the goals DHR set for her to regain custody of her children.
In late August 1997, because of the progress the mother was making, M.J. was returned to the mother's home. Within a few weeks, DHR received reports that M.J. had been absent from, or tardy for, school on several occasions. Upon further investigation, DHR also discovered that the mother had allowed M.J. to spend the night with a caretaker DHR believed to be irresponsible. On other occasions, M.J. asked other tenants in the mother's apartment building if she could stay with them after school because she could not get into her own apartment. The mother was evicted from her apartment, and, in October 1997, M.J. was returned to foster care. At the time she was returned to foster care, M.J. had been in her mother's custody for only two months.
After M.J. was again placed in foster care, the mother admitted that she was addicted to illegal drugs, including crack cocaine, crystal methamphetamine, and Lortab, a narcotic. DHR provided the mother with counseling and assisted her in finding a drug-treatment facility. However, after only two days, the mother left the drug-treatment facility against the advice of the medical staff.
DHR provided the mother with a new individualized service plan ("ISP") for the children, with which the mother substantially complied. DHR allowed the children to spend part of the 1998 spring-break holiday with her. At that time, the mother was living with J.H., her boyfriend. Within a few days, DHR again received reports that the mother was leaving the children unsupervised. The children reported that J.H. had hit the mother and that he had "whipped" them. On April 1, 1998, DHR again returned the children to foster care. The trial court ordered the mother to discontinue living with J.H.; it is undisputed that the mother disregarded that order and that she ended her relationship with J.H. only a few months before the April 2001 termination hearing.
In May 1998, the mother petitioned to regain custody of the children. However, when the mother failed to appear at the hearing scheduled on that motion, the trial court dismissed the petition.
In July 1998, DHR formulated another ISP for the mother. The mother complied with a number of the goals set forth in that ISP: she found housing; she kept a job for at least eight weeks; she provided for the children's needs during visitation; and she had five negative drug tests. The mother had also agreed to attend a six-month *4 outpatient drug-treatment program, but she left that program after approximately six weeks. A few weeks after she left that program, the mother entered an inpatient drug-treatment program, but she left that program after only a few days.
In October 1998, the trial court conducted a review hearing and ordered the mother to complete an inpatient drug-treatment program. The mother entered another inpatient drug-treatment program, and in December 1998, she completed that program and resumed visitation with the children. The children were returned to the mother's custody on December 25, 1998. DHR had filed a petition to terminate the mother and father's parental rights, but it dismissed that petition when the children were returned to the mother's custody in December 1998.
The children remained in their mother's custody for approximately 17 months, from December 25, 1998, until May 10, 2000. During that time, DHR continued to provide services and assistance to the mother; DHR paid the mother's rent, paid for day care for the children, and paid for food for the family. In addition, the DHR social workers began providing the mother with transportation to work, and began transporting the children to day care and to school. The DHR social workers reported that on several days when they arrived to provide transportation services, the mother was asleep and the family was not ready to leave.
On April 3, 2000, the mother quit her job. DHR social workers began to suspect from the mother's conduct and demeanor that she was once again using illegal drugs. During one home visit, a social worker noticed an empty bottle of Lortab tablets; the label indicated the prescription had been filled two days earlier. The mother said that she had sold the pills, and she refused to take a drug test.
On April 10, 2000, DHR formulated a safety plan for the children and asked the mother to submit to a drug test; she refused to do so. In early May 2000, DHR social workers noted that the mother's home was messy, and the mother asked DHR for money for food and rent, even though she had recently received a food-stamp allotment. On May 10, 2000, a DHR social worker found S.T.J. playing unsupervised under a parked automobile. S.T.J. was returned to foster care. DHR also filed a petition to take the other two children into protective custody. At the 72-hour hearing on that motion, the trial court ordered the mother to take a drug test; the results of that test were positive for cocaine.
Upon reviewing the case in June 2000, the trial court specifically found that the mother had again lost custody of the children because she had left the children unsupervised; she admitted to using cocaine; she was "unable or unwilling" to prepare the children for school and consequently they were late or failed to attend; and she was experiencing periods of depression. The trial court also noted that the mother blamed DHR for "failing to pay [her] rent."
In October 2000, the mother again tested positive for illegal drugs. In addition, in November 2000, the mother was arrested on charges of being in the possession of drug paraphernalia; she pleaded guilty. At the hearing, the mother testified that drug paraphernalia belonged to a friend, but she admitted that she had pleaded guilty to the charge related to possessing the paraphernalia.
In January 2001, the mother moved in with her aunt, N.D., and began working at a restaurant owned by N.D. N.D. testified that she told the mother that in order to continue living with her, the mother had to *5 follow N.D.'s rules. N.D. testified that the mother did well in her home for approximately two months, but that she believed, given the mother's demeanor and behavior, that the mother began using drugs again in February 2001. N.D. testified that in February, the mother started staying out late, and that she then did not come home for a week. N.D. also testified that approximately $250 was stolen from her restaurant, and that she suspected that the mother had stolen the money. The mother left N.D.'s home in February 2001; she lived with her mother for a few days and then moved into a mobile home.
The mother was residing in the mobile home at the time of the termination hearing; at the hearing, she testified that she had ended her relationship with J.H. and that she had been living with a new boyfriend, S.C., for approximately six weeks. The mother also admitted to being addicted to drugs, but she denied that she had recently used illegal drugs. The mother testified that she tended to relapse and use illegal drugs when she was stressed.
In July 2000, the trial court had ordered the mother to pay $25 per week in child support for the three children. At the time of the termination hearing in April 2001, the mother had made no child-support payments pursuant to that order. The mother testified that she had instead paid the fines in her criminal case and that she was attempting to have her driver's license reinstated.
The father was in prison when DHR filed its petition to terminate parental rights; he was released on parole after DHR had filed its petition to terminate the mother and father's parental rights. The father had been in prison since 1996. Upon his release from prison, the father resided in a halfway house. The father contacted DHR and started visiting with the children weekly. The DHR social worker testified that DHR did not offer services to the father because DHR had petitioned to terminate the father's parental rights and because, in February 2001, the father tested positive for the use of illegal drugs. The father testified that if he again tested positive for drug use while he was on parole, his parole would be revoked and he would be returned to prison.
After his release from prison, the father obtained employment, but he did not pay any support for the children. The father testified at the April 2001 termination hearing that he had, the week before the hearing, moved in with a girlfriend and that he planned to start a new job the day after the termination hearing. The social worker testified that DHR did not think that the father, who had been out of prison only two months when he tested positive for the use of illegal drugs, was a viable placement alternative for the children.
DHR presented evidence indicating that it had considered and evaluated alternative relative resources with whom to place the children. However, it is undisputed that none of the relatives were willing or able to take the children.
The social workers testified that, at the time of the hearing, DHR had been involved with this family for five years. The children had been in foster care since 1996, with the exception of a period lasting 17 months, during which the mother had custody of them. The social workers testified that although the children loved their parents, M.J. was dissatisfied with being a "foster child," and S.T.J. had exhibited some behavioral difficulties after he returned from a visit with the mother. The social workers testified that the children needed a permanent, stable home. M.J.'s foster mother testified that M.J. prayed for an adoptive family. DHR presented evidence indicating that it could place all *6 three children together in an adoptive home. DHR also presented evidence indicating that as the children got older, it would be more difficult to place them for adoption.
During the proceedings on this matter, the trial court, apparently on its own initiative, investigated the possibility of placing the children with Big Oak Ranch. The trial judge traveled to Big Oak Ranch and spoke with its administrators. Big Oak Ranch is made up of two campusesone for girls and one for boys; the two campuses are approximately 45 minutes apart. Children from the two campuses attend the same school; male and female siblings visit each other once a month, other than at school. Lee Barnett, the director of Big Oak Girls Ranch, testified that that facility was "a long-term facility."
A DHR social worker testified that DHR had considered but had rejected the option of placing the children in a group home such as Big Oak Ranch. The reasons it rejected that option included DHR's policy of attempting to place siblings together in the same home, the social workers' conclusions that the children are too young for a group home, and DHR's belief that the children are adoptable as a family.
Section 26-18-7, Ala.Code 1975, which sets forth the statutory authority for terminating parental rights, provides:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"....

*7 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
In reviewing a trial court's judgment entered on a petition to terminate parental rights, the court must consider that:
"Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419 (Ala.Civ. App.1994).
"`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala.Code 1975.'
"M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
"Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id." *8 A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
Although the trial court did not make a specific finding that the children were dependent, it found that neither parent was capable of providing a stable, suitable home for the children. Given the trial court's previous dependency determinations in this case, the facts of this case, and the nature of the factual findings contained in the June 5, 2001, judgment, we conclude that a finding of dependency was implicit in the trial court's judgment. See O.L.D. v. J.C., 769 So.2d 299 (Ala.Civ.App.1999) (where the trial court failed to make a finding of dependency, this court, in the interest of judicial economy, determined that the evidence supported such a finding). After carefully considering the evidence in the record, we must conclude that the evidence clearly supports a determination that the children are dependent.
After finding that a child is dependent, a trial court must analyze whether a viable alternative exists to the termination of the parents' parental rights. See Ex parte Beasley, 564 So.2d 950 (Ala.1990). The trial court determined that placing the children at Big Oak Ranch was a viable alternative to the termination of the mother and father's parental rights; therefore, it declined to terminate their parental rights. DHR contends on appeal that clear and convincing evidence was presented demonstrating that the parents have continuously failed to meet the needs of the children and that the children need a stable, dependable home; therefore, DHR argues, the trial court erred in refusing to terminate the mother and father's parental rights. We agree.
After DHR obtained custody of the children, the father was convicted of several crimes and was sentenced to 15 years in prison; he actually served little more than 4 years of that prison sentence. Although the father testified that he loved the children and that he would do anything to regain custody of them, he tested positive for illegal drug use only a couple of months after being released from prison. In addition, he paid no child support for the children after his release from prison, and, at the time of the hearing, had recently moved in with a girlfriend rather than establishing a home of his own.
DHR has provided the mother with extensive rehabilitation services. Although she did make progress at some points during the five years DHR has been intensively involved with the family, the mother has also relapsed. Only months before the termination hearing, the mother had again tested positive for illegal drug use. At the time of the termination hearing, she had only recently obtained new employment and housing with her new boyfriend.
The children have been in and out of foster care for five years. The evidence is undisputed that the children need and want a stable and permanent home. The record clearly demonstrates that in the five years the children have been out of the mother and father's custody, neither the mother nor the father has adjusted his or her circumstances to meet the needs of the children and provide them with the basic requirement of a stable home. DHR social workers testified that the children are adoptable and that they likely could be placed together in the same adoptive home; that chance, however, decreases as the children become older. The social workers also agreed that a group home was not an appropriate alternative for these children.
Although a parent has a prima facie right to custody of his or her child, the foremost consideration in deciding whether to terminate parental rights is the child's best interests. P.W. v. Houston County Dep't of Human Res., 771 So.2d 1057 (Ala. *9 Civ.App.2000); K.A.C. v. Jefferson County Dep't of Human Res., 744 So.2d 938 (Ala. Civ.App.1999). Where clear and convincing evidence establishes that the termination of parental rights is in the child's best interests, that consideration outweighs the parent's prima facie right to custody of the child. D.B. v. State Dep't of Human Res., 778 So.2d 837 (Ala.Civ.App. 2000); M.W. v. State Dep't of Human Res., 761 So.2d 246 (Ala.Civ.App.1999); V.M. v. State Dep't of Human Res., 710 So.2d 915 (Ala.Civ.App.1998).
The trial court found in its judgment that "[a] stable and predictable environment is one of the greatest needs of the minor child[ren]. [These children] cannot afford to spend the rest of [their] childhood waiting for [their] mother and father to also grow up." Given the length of time the children have already waited in foster care for their parents to become capable of caring for them, we conclude that placement at a group home for an indefinite period is not an appropriate option. Although this court in no way minimizes the excellent environment of the Big Oak Ranch or the much-needed service it provides to this State, under the particular facts of this case, we must conclude that the trial court abused its discretion in placing the children in that group home as an alternative to terminating the mother and father's parental rights.
This court is aware of the presumption of correctness in favor of the trial court's judgment. See A.R.E. v. E.S.W., supra. However, after carefully reviewing the record on appeal, we must conclude that the termination of the mother and father's parental rights is clearly in the best interests of the children and that the trial court abused its discretion in failing to terminate their parental rights. Therefore, we must reverse the trial court's judgment. The cause is remanded to the juvenile court to enter a judgment consistent with this opinion.
REVERSED AND REMANDED.
YATES, P.J., and PITTMAN, J., concur.
CRAWLEY and MURDOCK, JJ., dissent.
CRAWLEY, Judge, dissenting.
I dissent because I believe the majority has substituted its judgment for that of the juvenile court on the termination-of-parental-rights issue. Because I would affirm the trial court's decision not to terminate the parental rights of the mother and father, I would reach the issues regarding awarding custody to, and placing the children at, Big Oak Ranch.

The Termination-of-Parental-Rights Issue
A trial court's decision in proceedings to terminate parental rights is presumed correct when it is based on ore tenus evidence, as here, and its decision will be set aside only if the record reveals the decision to be plainly and palpably wrong. M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004 (Ala.Civ.App.1991). "`The reason for the ore tenus rule is [well established], i.e., that the trial court had the opportunity to observe the witnesses as they testified, to judge their credibility and demeanor, and to observe what this court cannot perceive from a written record.'" Ex parte Fann, 810 So.2d 631, 638 (Ala. 2001) (quoting Dobbins v. Dobbins, 602 So.2d 900, 901 (Ala.Civ.App.1992)).
As to the mother, the evidence supports a finding that she loves the children, that she has cooperated with DHR, and that she was capable of adjusting her circumstances to meet the needs of the children. While DHR has had custody of these children, the children actually remained with *10 the mother for a 17-month period, until May 2000. During that time, the mother remained employed and apparently free of drugs, the family survived a house fire, successfully relocated to a new home in Blount County, and the mother was a featured guest at a banquet for foster-care families where she was touted as a "success story." On October 19, 1999, the juvenile court commended the mother for her "remarkable progress" and released DHR from supervision of the children. The evidence supports a finding that the primary (if not the sole) obstacle to the mother's having the children returned to her is her substance-abuse problem. The juvenile court must have concluded that DHR had not met its burden of showing, by clear and convincing evidence, that the mother was "unable or unwilling to discharge [her parental] responsibilities." See 26-18-7(a), Ala.Code 1975.
Section 26-18-7(a)(6) requires DHR to make an effort to rehabilitate a parent before it seeks to terminate his or her parental rights. See Ezekiel v. State Dep't of Human Res., 562 So.2d 524, 525 (Ala. Civ.App.1990). In the father's case, the evidence warrants a finding that reasonable efforts to rehabilitate him have not even been attempted. The court was authorized to conclude that DHR had not met its burden of showing that "reasonable efforts by [DHR] ... leading toward the rehabilitation of the [father] ha[d] failed." See § 26-18-7(a)(6). The testimony established that DHR had "developed a case plan" for the father but had made no effort to implement the plan once it learned that the father had tested positive on a drug test in February 2001two months after he was paroled and four months before the termination hearing. Here, as in D.S.S. v. Clay County Department of Human Resources, 755 So.2d 584, 589 (Ala.Civ.App. 1999), the DHR caseworker "acknowledged that DHR did not have a service agreement with the father, did not suggest any rehabilitation programs to the father, and did not warn the father that, unless he made substantial efforts to satisfy DHR that he was a fit parent for the children,... his parental rights" would be terminated. DHR could not simply rely on the father's past record of incarceration and drug use to determine that he was unworthy of rehabilitative efforts. "This court has held that `evidence of current conditions or conduct relating to a parent's ability or willingness to care for his ... children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.'" V.M. v. State Dep't of Human Res., 710 So.2d 915, 920 (Ala.Civ.App.1998) (quoting Bowman v. State Dep't of Human Res., 534 So.2d 304, 306 (Ala.Civ.App.1988)).
"After thoroughly reviewing the record,... [I] cannot [agree] that the trial court erred by refusing to terminate the [parents'] parental rights. To so hold would be to substitute [my] judgment for that of the trial court." S.M.W. v. J.M.C., 679 So.2d 256, 258 (Ala.Civ.App.1996).

The Custody and Placement Issues
Section 12-15-71(a) states the dispositional options that are available to the juvenile court after it finds that a child is dependent. That section provides in pertinent part:
"(a) If a child is found to be dependent, the court may make any of the following orders of disposition to protect the welfare of the child:
"(1) Permit the child to remain with the parents, guardian, or other custodian of the child, subject to conditions and limitations as the court may prescribe.
"(2) Place the child under protective supervision as herein provided or *11 under the supervision of the Department of Human Resources.
"(3) Transfer legal custody to any of the following:
"a. The Department of Human Resources; provided, that the department is equipped to care for the child.
"b. A local public child-placing agency or private organization or facility willing and able to assume the education, care, and maintenance of the child and which is licensed by the Department of Human Resources or otherwise authorized by law to receive and provide care for the child.
"c. A relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child.
"(4) Make any other order as the court in its discretion shall deem to be for the welfare and best interests of the child.
"(5) In appropriate cases, award permanent custody to the Department of Human Resources or to a licensed child-placing agency with termination of parental rights and authorization to place for adoption, without appointing a legal guardian or guardian of the person, or award temporary custody to the same without appointing a legal custodian or guardian or guardian of the person."
In the present case, the juvenile court found the children dependent, and it transferred their legal custody from DHR to Big Oak Ranch. The juvenile court's transfer-of-legal-custody decision is authorized by § 12-15-71(a)(3)(b), allowing the juvenile court to transfer the legal custody of dependent children to
"[a] local public child-placing agency or private organization or facility willing and able to assume the education, care, and maintenance of the child and which is licensed by the Department of Human Resources or otherwise authorized by law to receive and provide care for the child."
(Emphasis added.) Although Big Oak Ranch is not licensed as a "child-placing agency,"[1] it is "licensed by [DHR]" as a "child-care institution."[2] For present purposes, *12 the distinction between a "licensed child-placing agency" and a "licensed child-care institution" lies in the fact that only a licensed child-placing agency "ha[s] authority to make permanent plans for the child, including the authority to place for adoption and consent to adoption." § 26-18-8(1), Ala.Code 1975. DHR argues that the juvenile court's order transferring legal custody to, and directing placement of the children at, Big Oak Ranch is erroneous because, DHR contends, the order violates the consent decree in R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997), aff'd, 145 F.3d 363 (11th Cir.1998). I disagree.
According to DHR, the juvenile court's judgment violates the consent decree in R.C. in the following respects: (1) it does not place the children in the "least restrictive, most normalized living conditions appropriate to their strengths and needs;" (2) it separates siblings; (3) it does not allow for the children to be adopted. The consent decree states:
"a. .... The [child's] own home shall be considered the least restrictive, most normal placement. Following are other placements listed in ascending order in terms of restrictiveness: independent living; a foster home; a therapeutic foster home; a group foster home; a group home; a child care institution; an institution....
"b. Siblings shall be placed together."
Consent Decree ¶ 48.a. (footnotes omitted). DHR points out that, as a "child-care institution," Big Oak Ranch is the second most restrictive placement possible. It also points out that because Big Oak Ranch maintains separate campuses for boys and girls in different counties, placement of the children at Big Oak Ranch will necessarily separate the two sisters from their brother. Finally, DHR argues, transferring custody of these children to Big Oak Ranch, which is not a licensed child-placing agency, will deny the children the opportunity to be adopted.
In R.C., a class of children in the custody of DHR sued the Commissioner of DHR, alleging that DHR's operation of the State child-welfare and foster-care systems violated their constitutional and statutory rights. The consent decree represents the parties' settlement agreement in lieu of a trial on those allegations. See R.C. v. Nachman, 969 F.Supp. 682, 688 (M.D.Ala. 1997). The consent decree established "a set of `operating principles' or `standards'" by which DHR agreed to be bound and it "direct[ed] [the Commissioner] to ensure that [DHR's] child protective services and foster care systems compl[ied] with these principles or standards by a date certain.... [The consent decree] contemplate[d] the development of a comprehensive array of services for [the children] over a period of seven years." Consent Decree, Introduction, at 2.
A consent decree "embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). A consent decree is a "final judgment binding upon those who had had notice and opportunity to object; it was and is a legally enforceable obligation." Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 590-91, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (Stevens, J., concurring in the judgment). Like any judgment, a *13 consent decree is not binding on one who was not a party, or in privity with a party, to its terms. See Sierra Club v. Whitman, 268 F.3d 898, 900 n. 1 (9th Cir.2001).
I conclude that the juvenile court's order does not violate the consent decree entered in R.C. because it does not require DHR to take any action in contravention of the consent decree. First, the judgment denies DHR's petition to terminate parental rights. Then, it relieves DHR of legal custody of S.T.J., M.J., and B.J. Finally, it transfers legal custody and placement of the children to Big Oak Ranch. The judgment does require something of Big Oak Ranchthat it assume legal custody and placement of the children. However, Big Oak Ranch was not a party, or in privity with a party, to the R.C. consent decree. For the entity that was a party to the R.C. consent decreeDHRthe juvenile court's judgment imposes no duty or obligation, much less a duty or obligation in contravention of R.C.
Section XII of the consent decree implicitly recognizes that a juvenile court's order binds only DHR. Section XII provides, in pertinent part:
"Primacy of this Decree.
"83. [The Commissioner of the DHR] must comply with his obligations under this decree and the Implementation Plan, despite orders to the contrary issued by any state official or by any state court (including in the course of Juvenile Court proceedings).62
"84. Despite orders to the contrary issued by any state official or by any state court (including in the course of Juvenile Court proceedings), defendant may refuse to place [children] in particular placements and may refuse to provide [the children] and their families particular services if doing so would require [the Commissioner of the DHR] to violate his obligations under this decree of the Implementation Plan.
"85. Despite orders to the contrary issued by any state official or by any state court (including in the course of Juvenile Court proceedings), [the Commissioner of the DHR] may refuse to provide DHR-funded services to a [child] or a member of the [child's] family before a determination has been made, acceptable to DHR, whether the services are appropriate for the [child] or family member.
"86. Only this Court, the monitor, or another person or entity appointed by the Court shall have the authority to determine compliance with this decree.
"87. Nothing in this decree is intended to create an independent cause of action, right, or liberty or property interest under state law.
"62 Paragraphs 83-85 should not be interpreted as requiring the [Commissioner of the DHR] to place himself in contempt of a state court order before seeking protection or relief from this Court. Instead, they should be interpreted as requiring [the Commissioner of the DHR] to seek relief from this Court from any state court order that would require action contrary to this decree."
Consent Decree, ¶¶ 83-87 & n. 62. As footnote 62 of the consent decree implicitly recognizes, a violation of the consent decree occurs if DHR complies with an order requiring it to perform some act in violation of its obligations under the consent decree without first "seek[ing] relief from [the federal district] Court from any state court order that would require action contrary to this decree." Because the juvenile court's judgment does not require any action from DHR, it does not violate the consent decree.
*14 Although I do not believe that the juvenile court's judgment transferring custody and placement of the children to Big Oak Ranch violates the consent decree in R.C., I nevertheless conclude that it should be reversed because it constitutes an abuse of discretion. A juvenile court awarding custody and ordering placement of a dependent child must act in the child's "best interests." See § 12-15-71(4), Ala.Code 1975. This court reviews the juvenile court's order under an abuse of discretion standard. Id. For the reasons that follow, I believe the juvenile court abused its discretion by transferring custody to, and ordering placement of the children with, Big Oak Ranch.
(1) The juvenile court's custody and placement decision is inconsistent with its decision on the termination issue. Relieving DHR of the custody of these children would result in the anomaly of denying the parentswho, the trial court has implicitly found, are not irredeemably unfitany further services from DHR. The court's order apparently finds that the parents are subjectively willing but currently unable, because of substance-abuse problems, to shoulder their parental responsibilities. Yet the order, by removing DHR from the case, cuts off a source of helping the parents achieve the ability to meet those responsibilities.
It is obvious that, with respect to the mother, DHR did an exemplary job of making rehabilitative services available to her. The mother's progress at certain points over the last five years is due, no doubt in large part, to DHR's sustained efforts to reach the goals set out in § 12-15-1.1, Ala.Code 1975: preserving and strengthening families; working toward the reunification of dependent children with their families; securing necessary treatment for dependent children; and providing services for the families of dependent children. As a private agency, Big Oak Ranch is not bound by those goals. In fact, the testimony indicates that Big Oak Ranch has very limited visitation opportunities for parents, much less rehabilitative services for them. Big Oak Ranch exists to care for children, not to reform their parents. By declining to terminate parental rights, the juvenile court found that the parents were not beyond hope of reform, yet by removing DHR as the legal custodian in this case, the juvenile court foreclosed the State from having any oversight of the parents' progress towards reform. The two parts of the order are inconsistent and cannot, I conclude, be deemed to be in the best interests of the children.
(2) The juvenile court's custody and placement decision contravenes legislative goals for the juvenile court set out in § 12-15-1.1, Ala.Code 1975. That statute states, in pertinent part:
"This chapter shall be known as the Alabama Juvenile Justice Act. The purpose of this chapter is to facilitate the care, protection, and discipline of children who come within the jurisdiction of the juvenile court, while acknowledging the responsibility of the juvenile court to preserve the public peace and security.
"In furtherance of this purpose, the following goals have been established for the juvenile court:
"(1) To preserve and strengthen the child's family whenever possible, including improvement of home environment.
"(2) To remove the child from the custody of his or her parents only when it is judicially determined to be in his or her best interest or for the safety and protection of the public.
"(3) To reunite a child with his or her parents as quickly and as safely as possible when the child has been *15 removed from the custody of his or her parents.
"(4) To secure for any child removed from parental custody the necessary treatment, care, guidance, and discipline to assist him or her in becoming a responsible productive member of society.
"(5) To promote a continuum of services for children and their families from prevention to aftercare, considering wherever possible, prevention, diversion, and early intervention.
"....
"(8) To achieve the foregoing goals in the least restrictive setting necessary, with a preference at all times for the preservation of the family and the integration of parental accountability and participation in treatment and counseling programs."

(Emphasis added.) Although, as I have previously discussed, the trial court's custody and placement decision does not violate the consent decree in R.C. on the ground that it fails to place the children in the least restrictive setting possible, it does violate the statutory goal of "least restrictiveness" set by the Alabama legislature.
(3) The juvenile court's custody and placement decision contravenes the recommendation of the children's therapist, the wishes of the children themselves, the advice of DHR, and the urging of the children's pediatrician. Jan Lasseter, a licensed professional counselor specializing in child and adolescent psychology, testified that she had been treating the children since 1996. She gave her opinion that the children are "bonded as a sibling group[,] ... are dependent upon one another for stability and permanence," and should not be separated. She stated that the children had told her they did not want to go to Big Oak Ranch and she did not think placement there would be in their best interests. She said that she and the children had developed a close therapeutic relationship over the last five years and that relationship would come to an end if the children lived at Big Oak Ranch, because Big Oak Ranch had its own counselors. The trial court spoke with the children personally and heard their objections to placement at Big Oak Ranch.
Dr. David Chupp, the children's pediatrician, testified that he was familiar with the program and facilities at Big Oak Ranch. He gave his opinion that Big Oak Ranch was an appropriate placement for older teenagers, but not for children as young as S.T.J., B.J., and M.J. He told the trial court that he and his wife had been house parents at a child-care facility in Georgia that is similar to Big Oak Ranch and, based on that experience, he recommended that these children not be "institutionalized."
(4) The juvenile court's custody and placement decision seemingly discounts the undisputed testimony of the children's foster parents.
At the time of the hearing in this case, M.J., the oldest child, had been living with one foster family and the two younger children, B.J. and S.T.J., had been living with another foster family, for several years. Although two of the siblings live apart from the third, the two foster families are well acquainted with each other and arrange for the three children to be together at least four times per week. The foster parents explained that one of them has a swimming pool and all three children regularly congregate at that house to swim and to play. The foster parents also arrange other activities so that the children can be together as a sibling group. Both sets of foster parents testified that they loved the children who were placed in their care and that M.J., *16 B.J., and S.T.J. were welcome to live with them until they married or were otherwise emancipated.
The testimony regarding the treatment of siblings at Big Oak Ranch was undisputed. Girls live on one campus and boys live on another, approximately 45 minutes away. The boys and girls go to school together at the same private school, Westbrook Christian Academy. At school, however, siblings have no regular opportunity to see each other and are not likely to interact in any way other than the chance encounters any other students would have in the hallways between classes or at lunch. Sibling visitation is allowed once a month, except during the summer, when the residents of the girls ranch and the boys ranch meet together once a week.
I would affirm the juvenile court's decision declining to terminate the parental rights of the mother and father because I conclude that to do otherwise would be to substitute my judgment for that of the trial court. "This court does not often reverse a trial court's custodial decision." D.K.G. v. J.H., 627 So.2d 937, 938 (Ala.Civ. App.1993). However, under the unique circumstances of this case, I believe that affirming the trial court's termination decision would necessarily result in reversing the trial court's custody and placement decision. I cannot escape the conclusion that the custody and placement decision is unsupported by the evidence, plainly and palpably wrong, and an abuse of discretion. See D.K.G. v. J.H., supra.
MURDOCK, Judge, dissenting.
In order to reverse the trial court's judgment in this case, we must override the trial court's finding that placement with Big Oak Ranch, Inc., was a viable alternative, and that the best interests and welfare of the children would be served by placing them at Big Oak Ranch, rather than with DHR. These findings were made by the trial court based on the evidence presented to it, most of it presented ore tenus, and the exercise by the trial court of its statutorily granted discretion based on that evidence. Moreover, under applicable precedents, the trial court was obligated to deny DHR's petition for termination of parental rights unless the trial court, in its judgment, found clear and convincing evidence to the contrary. Given the record in this case, I believe that, in order to disturb the trial court's findings, this court must reweigh the evidence and substitute its judgment for that of the trial court. This we cannot do.
The main opinion in this case summarizes much of the history of the custody of the children at issue. As indicated in that opinion, a second individualized service plan ("ISP") was developed by DHR for the mother in July 1998. Under the terms of that plan, the mother was required to maintain safe housing for the children, keep a job for at least eight weeks with the same employer, provide for the children's needs during visits, and submit to drug testing. The mother complied with all of the terms of this ISP. She had five negative drug tests and agreed to enter a six-month outpatient program at a drug-treatment center. Although she entered the program on July 29, she left on September 14, and was then discharged from the program for absenteeism. Several weeks later, the mother entered an inpatient drug-treatment program at another drug-treatment facility, but stayed there only a few days before leaving against medical advice.
The trial court conducted a review hearing on October 13, 1998, and ordered the mother to complete an inpatient drug-treatment program. The mother went to a facility in Tuscaloosa, completed a drug-treatment program on December 6, and resumed visitation with her children. The *17 children were returned to her on Christmas Day 1998. DHR subsequently dismissed a petition for termination of the mother's parental rights it had filed before the mother completed the Tuscaloosa program.
Following this successful response by the mother, the children remained with the mother for a year and five months, until May 2000. During that time, the mother remained employed and apparently free of drugs; the family survived a house fire and successfully relocated to a new home in Blount County. The mother was a featured guest at a banquet for foster-care families where she was touted as a "success story." On October 19, 1999, the trial court commended the mother for her "remarkable progress" and released DHR from supervision of the children.
At the termination-of-parental-rights hearing on April 25, 2001, the mother testified that she was currently attending meetings at Alcoholics Anonymous and Narcotics Anonymous.
The last ISP prepared by DHR stated that the mother knew how to parent her children, had been very cooperative with DHR, and loved her children and that her children loved her. There was evidence indicating that both the mother and father regularly exercised their right to visitation with their children.
The record further reflects DHR's current petition to terminate parental rights corresponds with the requirement in Ala. Code 1975, § 26-18-5(b), that DHR must seek termination of parental rights once a child has remained in foster care for 15 of the most recent 22 months. It appears, in other words, that DHR's petition was filed to satisfy DHR's obligation under § 26-18-5(b).
It also appears, however, that the trial court's judgment and the result achieved by it fall entirely within the parameters of discretion afforded the trial court under Ala.Code 1975, § 12-15-71(a). That statute provides:
"If a child is found to be dependent, the court may make any of the following orders of disposition to protect the welfare of the child:
"(1) Permit the child to remain with the parents, guardian, or other custodian of the child, subject to conditions and limitations as the court may prescribe.
"(2) Place the child under protective supervision as herein provided or under the supervision of the Department of Human Resources.
"(3) Transfer legal custody to any of the following:
"a. The Department of Human Resources; provided, that the department is equipped to care for the child.
"b. A local public child-placing agency or private organization or facility willing and able to assume the education, care, and maintenance of the child and which is licensed by the Department of Human Resources or otherwise authorized by law to receive and provide care for the child.
"c. A relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child.
"(4) Make any other order as the court in its discretion shall deem to be for the welfare and best interests of the child.

"(5) In appropriate cases, award permanent custody to the Department of Human Resources or to a licensed child-placing agency with termination *18 of parental rights and authorization to place for adoption, without appointing a legal guardian or guardian of the person, or award temporary custody to the same without appointing a legal custodian or guardian or guardian of the person."
(Emphasis added.)
In its judgment, the trial court declined to terminate the parental rights of either the father or the mother in this case, finding instead at least one viable alternative to the termination of parental rights. In a separate order dated June 11, 2001, the trial court emphasized that it had
"declined to terminate parental rights... because DHR [presented] clear and convincing evidence on neither of the following points: (1) that prior actions and/or conditions of the parents [are] unlikely to change in the foreseeable future[;] (2) that other viable alternatives to termination do not exist."
(Emphasis in original.) Consistent with a finding that awarding custody of the children to Big Oak Ranch would be a viable alternative that could prevent the harm to the children of a termination of their parents' rights and a complete severance of all ties with the parents, the trial court granted to the parents the right to visit with the children, subject to the rules of Big Oak Ranch.[3]
Portions of the trial court's judgment are noteworthy:
"1. That the Court declines to terminate the above-named parent's parental rights at this time; and further, the Court finds that at least one preferable, viable, alternative exists to the termination of parental interests.
"2. That the custody of the above-named minor child[[4]] is hereby awarded to the Big Oak Ranch, Inc., effective June 12, 2001, and that the custody of said child previously held by DHR is hereby terminated effective June 12, 2001. Additionally, the parents of said child are granted visitation per the directions, rules, and guidelines of Big Oak Ranch, Inc.
"....
"5. That, in part, the above decision is based on the following findings, observations, and conclusions of this Court:
"(a) A stable and predictable environment is one of the greatest needs of the minor child referenced in this case. This child cannot afford to spend the rest of his childhood waiting for his mother and father to also grow up. It appears to the Court that the Big Oak Ranch can provide that stability, and yet at the same time, offer the child an opportunity to maintain ties with his natural parents.
"(b) One of the few consistencies the children involved in this matter have enjoyed in their lives is their relationships with their siblings. It appears that the Big Oak Ranch offers great potential for the children to retain those ties.
"(c) That, though both parents have spent far more of their children's lives dealing with their individual personal problems and self-gratification *19 than they have spent meeting the needs of their children, at least, to some extent, both parents have put some of their prior bad acts behind them and exhibited a desire to be involved in the lives of their children.
"(d) That neither parent appears capable of offering a suitable, stable environment for the children without assistance from others; and that the arrangements initially suggested by the parents appear to be either unpredictable and/or contingent upon unpredictable factors."
Parental rights are fundamental; they have long received protection under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and the cases summarized therein. The strict-scrutiny analysis employed in regard to fundamental constitutional rights requires that there be a compelling state interest to justify state interference with a parent's care, custody, and control of his or her children. G.P. v. A.A.K., [Ms. 2000496, Dec. 21, 2001].[*] Our decisions reflect concern that children are harmed, or threatened with harm, when they are not provided the opportunity to be raised by a stable, fit, and loving parent. See, e.g., Ex parte Terry, 494 So.2d 628 (Ala.1986). It is the avoidance of such harm that justifies state interference with parental rights.
Strict-scrutiny analysis also requires, however, that interference with parental rights, even where justified by a compelling state interest, be done in the least restrictive manner possible. See G.P., supra. Consistent with this requirement,[5] our decisions have held that the State may not terminate parental rights where there is a viable alternative to doing so. E.g., Ex parte Beasley, 564 So.2d 950 (Ala. 1990). Indeed, Ala.Code 1975, § 12-15-71(a), provides a number of alternatives to termination, including, without limitation, *20 placement of the child with a private organization or facility willing and able to assume the child's education, care, and maintenance, and placement of the child with a relative or other individual found qualified by DHR. This court has held:
"The phrase `in appropriate cases' [in § 12-15-71(a)(5)] is found within the context of a statute which sets forth numerous alternatives for the disposition of a dependent child. We think the presence of these less drastic measures serves to limit and define those instances where the severance of the parent-child relationship may be deemed `appropriate.'"
Miller v. Alabama Dep't of Pensions & Sec., 374 So.2d 1370, 1376 (Ala.Civ.App. 1979). In appropriate cases, the alternatives identified in § 12-15-71(a) may be pursued to enable the parent to rehabilitate himself or herself and allow for reunification with the child, or to enable the parent and child to continue benefiting from some preexisting relationship through continued visitation with one another. See, e.g., W.L.H. v. B.L.M., 829 So.2d 173 (Ala.Civ.App.2002) (Murdock, J., concurring in the result and joined by two other judges, noting that the "viable-alternatives" prong under Ex parte Beasley may not be read so narrowly, as a matter of state law, as to be limited to family reunification); D.C. v. J.C., 842 So.2d 17 (Ala.Civ.App.2002) (lead opinion concluding that a viable alternative to termination of parental rights existed in the form of maintaining "the present situationmaintain[ing] custody with the grandparents and maintain[ing] ... supervised visitation" with the parents); S.M.W. v. J.M.C., 679 So.2d 256 (Ala.Civ.App.1996).
Even in some situations involving a degree of permanent incapacity or other unfitness on the part of the parent, alternative placement may effectively and reasonably avoid the harm of a child's being raised by a generally unfit parent, while doing so in a manner that, in an appropriate case, allows the child to benefit from some continued visitation or other relationship with a parent. In such a case, a placement consistent with the provisions of § 12-15-71(a)that is, with an appropriate private facility, relative, or other custodianmay avoid the psychological or emotional harm of completely severing all ties with a parent with whom the child has bonded emotionally. See also V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998) (recognizing that past events could have been grounds for termination of parental rights, but that viable alternatives currently existed to that termination and that "[h]owever well-intentioned the trial court's emphasis on the children's permanent placement may have been, the permanent separation of children from a parent remains a traumatic event that is not necessarily in the children's best interests").
In short, when an alternative exists that effectively and reasonably alleviates the harm or threatened harm of a child's not being raised by a fit, loving, and stable parent, strict-scrutiny analysis calls for the State to pursue that alternative. In the present case, the trial court concluded that it had identified just such an alternative to the termination of parental rights. Further, by selecting this alternative, the trial court was acting within the broad discretion granted it in § 12-15-71(a). I cannot say as a matter of law that the trial court's exercise of that discretion is not supported by substantial evidence.
DHR argues, among other things, that the trial court's judgment violates the consent decree entered in R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997), aff'd, 145 F.3d 363 (11th Cir.1998). I do not find the R.C. consent decree applicable in this case. Among other things, I note that the consent decree clearly applies to a defined *21 class of children: "all children who are now, or in the future will be, children in foster care and/or DHR custody who have emotional or behavioral disorders."[6]R.C., 969 F.Supp. at 687 (emphasis added). The children in this case do not fall within that class.
The record in this case contains substantial evidence that supports the trial court's judgment. Nonetheless, DHR also objects to the trial court's judgment on the ground that it separates the siblings. Nothing in the record indicates that the trial court did not consider the fact of this separation in reaching its finding as to the best interests of the children. Further, the evidence reflects that, although the two younger children, B.J. and S.T.J., currently live together in the same foster home and have a very close relationship, the children have been separated for most of their lives at various foster homes. A DHR social worker testified that the children had been placed in four different foster homes since May 2000. The evidence further reflects that the periods during which the children all lived together were mostly when they lived with their mother. The trial court also could have considered the fact that the two older children, M.J. and B.J., will be placed together at Big Oak Ranch under its judgment. Indeed, the trial judge stated in his order denying DHR's postjudgment motion that "the children have bonded with their natural parents" and "at least two of the children clearly do not want their parents out of their lives." The trial court accomplished this desire of the children, while at the same time keeping two of the children together.
The trial court heard extensive testimony from Lee Barnett, the director of Big Oak Girls Ranch in Springville, and Mary Ingram Graham, a social worker employed by the Ranch. Both witnesses testified regarding Big Oak Ranch and its two privately funded locations for girls and boys. Mr. Barnett testified that Big Oak Girls Ranch currently has five homes, with a sixth home under construction. Each home is a 6,000 square foot, brick home, housing a maximum of eight children with an adult couple (husband and wife), who serve as the house mother and father. The Ranch has a gymnasium and a children's center, as well as a 35-acre fishing and swimming lake at the Big Oak Girls Ranch. The testimony heard by the trial court was that there are numerous additional extracurricular activities at the Ranch, including swimming pools and an equestrian program.
According to the witnesses' testimony, all children at both the Boys and Girls Ranches attend Westbrook Christian School. Westbrook Christian School has approximately 615 students, approximately 80 of whom are residents of Big Oak Ranch. The witnesses further explained that Big Oak Ranch is a long-term facility prepared to meet the needs of the children in its care through high school and college.
The court heard testimony that several sibling groups reside at the Boys and Girls *22 Ranches, and that the siblings are given opportunities to maintain their bonds. Although the Boys Ranch is in Glencoe and the Girls Ranch is located in Springville, the children residing at both Ranches interact with one another daily during the school year at Westbrook Christian School. There are also monthly visitations between male and female siblings during the school year, and the residents at both Ranches meet each Friday during the summer months.
Barnett and Graham further testified that the children residing at the Ranches experience a "family atmosphere" in their respective homes. The testimony is undisputed that the children eat as a family, get ready for school, are required to perform chores around the house, and are expected to spend at least an hour each night studying or reading. The house parents are employees of Big Oak Ranch and are not employed outside the Ranch. Their duties include running the home and helping the children with their schoolwork and other needs.
The trial court also heard testimony that Big Oak Ranch, in addition to providing for the children's educational needs through high school, provides for the children's emotional and medical needs. Dentists, orthodontists, medical doctors, and psychologists donate their time and facilities to meet the needs of the children.
The trial court also heard extensive testimony from the representatives of the Ranch regarding the high priority the Ranch places on visitation between children and their natural parents and the Ranch's promotion of that visitation. Graham testified as follows:
"A. I'm the one that coordinates all visits. If there needs to be monitoring going on, I'm the one working with the house parents on making sure that's done appropriately. Also with supervisedthere is a difference between monitoring a visit and just supervising a visit. And I'm the one that seeks and makes sure that gets done appropriately.
"Right now we do not have a girl at the Girls Ranch that does not see their family. Lee [Barnett] mentioned the most extensive thing we would do would be cut off visitation. But we realize that ... if this child wants to visit their family, then we need to make that possible because the child needs to come into their own realization about the family. And we might be harming the child if we say no, you can't visit your family. We're going to try to work it so they can visit them. And that's where the monitoring of supervised visits comes in.
"After a positive supervised visit in the home, then visitation would then go to a monitored visit on the ranch. There are several activities that we encourage the parents and the children to do on the ranch: swimming, fishing, canoeing. And it's all there in the vicinity. And then if everything goes positive from there, the parents can progress to off-ranch visits which would be going to McDonald's [restaurant] and getting lunch or going shopping at The Summit [a shopping center in Birmingham], whatever the child and parent would want to do that would be positive and okay.
"If the family has an environment, a home environment for overnight visitation and it's approved, then we want the child to be able to go and spend that time also with the family. At that point I would go in and monitor the situation, see the home environment. We would expect the parent to make contact with me and keep up with me and let me know if something happens about the situation.

*23 "A lot of time we use extended family for this also. We have grandparents, aunts and uncles, and if the child's parent is in prison or is homeless, or whatever, we try to find an extended family member that would be a positive contact for that child."
"This court does not often reverse a trial court's custodial decision." D.K.G. v. J.H., 627 So.2d 937, 938 (Ala.Civ.App.1993). Moreover, the deference we normally must give in a custody case is even greater where a trial court denies a petition to terminate parental rights because the trial court must deny such a petition unless it is persuaded by what it considers to be "clear and convincing evidence" of the dependency of the child and the lack of viable alternatives to termination. See Ala.Code 1975, §§ 12-15-65(f) and 26-18-7(a); Ex parte Beasley, supra; Ex parte Ogle, 516 So.2d 243 (Ala.1987). Thus, to overturn the trial court's finding in the present case, we must be able to conclude, as a matter of law, that the only reasonable conclusion the trial court could have drawn from the evidence before it, most of which it heard ore tenus, was that DHR clearly and convincingly established that termination was warranted and that there was no viable alternative to termination.
As our Supreme Court recently stated in Ex parte H.H., 830 So.2d 21 (Ala.2002):
"`Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.'"
830 So.2d at 25 (quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996)); see also Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) ("Only where the findings are not supported by the evidence and are clearly erroneous should an appellate court decide that the facts are not as the trial court found them to be.").
In its order of June 11, 2001, the trial court emphasized the proper legal standard while explaining that "DHR failed to present clear and convincing evidence ... that other viable alternatives to termination do not exist." (Emphasis in original.) To now disturb the judgment of the trial court, based on the record before us, would in my opinion require us to reweigh the evidence and to substitute our judgment for that of the trial court. Alabama law does not allow this. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala. Civ.App.1985).
In light of the foregoing, I respectfully dissent.
NOTES
[1] Section 38-7-2(3), Ala.Code 1975, defines a "child-placing agency" as follows:

"A public or private child-care facility which receives, places, or arranges for the placement of any child or children in adoptive or foster family homes or other facilities for child care apart from the custody of the child's or children's parents. The term `child-placing agency' includes, but is not limited to, all agencies established and maintained by a municipality or other political subdivision of the State of Alabama to protect, guard, train or care for children outside their own homes, but does not include any circuit court or juvenile court or any duly appointed juvenile probation officer or youth counselor of the court who receives and places children under an order of the court.
[2] Section 38-7-2(2), Ala.Code 1975, defines a "child-care institution" as follows:

"A child-care facility where more than 10 children are received and maintained for the purpose of providing them with care or training or both, or transitional living program services, but does not include:
"a. Any institution for child care which is under the ownership or control, or both, of the State of Alabama, or which is operated or certified or licensed by another agency or department of the State of Alabama;
"b. Any juvenile detention home established and operated by the State of Alabama;
"c. Any bona fide boarding school in which children are primarily taught branches of education corresponding to those taught in public schools, grades 1 through 12, or taught in public elementary schools, high schools or both elementary and high schools."
[3] The parents do not consider this arrangement to be an unwarranted intrusion into their parental rights. Both of the parents and the children's guardian ad litem have filed a joint brief to this court not only accepting this arrangement, but urging affirmance of the trial court's judgment.
[4] The trial court entered separate but essentially identical judgments as to each of the three children.
[*] Note from the reporter of decisions: On July 19, 2002, the Court of Civil Appeals, on application for rehearing, withdrew the December 21, 2001, opinion and substituted another one.
[5] Our parental termination statutes do not specifically require a finding that all viable alternatives to termination be considered. See Ex parte F.P., [Ms. 1002146, Feb. 22, 2002] ___ So.2d ___ (Ala.2002) (Stuart, J. dissenting). (Note from reporter of decisions: On March 21, 2003, on application for rehearing, the Alabama Supreme Court withdrew its February 22, 2002, opinion and substituted a new one. Justice Stuart dissented and issued a dissenting opinion on March 21, 2003.) It appears that the "no-viable-alternatives" or "no-less-drastic-alternative" requirement originated because of constitutional issues raised in Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976). Roe, which involved the termination of a mother's parental rights to a "neglected" child, as that term was defined in the Code of Alabama 1940, stated:

"[T]he Constitution includes the right to family integrity among the fundamental rights secured to all persons. This right is applied to the States through the Fourteenth Amendment and is accorded strong protection from state interference. States, in the exercise of their inherent police powers, may abrogate such rights only to advance a compelling state interest and pursuant to a narrowly-drawn statute restricted to achieve only the legitimate objective. It is not disputed that the State of Alabama has a legitimate interest in the welfare of children.... The State's interest, however, would become `compelling' enough to sever entirely the parent-child relationship only when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing."
Roe, 417 F.Supp. at 779. With the enactment of the Alabama Juvenile Justice Act, however, the concept of "neglected" children was merged into the definition of a "dependent child." Compare Ala.Code 1975, § 12-15-1(10)d. through i., m., and n., with Ala.Code 1940, Tit. 13, § 350(1) and (2). See also Hunley v. Houston County Dep't of Pensions & Security, 365 So.2d 81, 84 n. 1 (Ala.Civ.App. 1978) (stating that § 12-15-1 et seq. had rewritten the offending provisions of the 1940 Code that Roe had discussed and "incorporat[ed] the suggestions set out in [Roe] with respect to its constitutional validity").
[6] The consent decree in R.C. elaborates on this class definition by stating:

"The class consists of the following children:
"a. Children with severe emotional or behavioral problems who are in foster care and/or DHR custody, or who are at imminent risk of placement into foster care and/or DHR custody....
"b. Children with moderate or mild emotional or behavioral problems who are in foster care and/or DHR custody, or who are at imminent risk of placement into foster care and/or DHR custody....
"c. Children who are at high risk of developing emotional or behavioral problems and who are at imminent risk of placement into foster care and/or DHR custody."
Consent Decree ¶ 7.